Argued 5 December, 1905, decided 23 January, 1906.

## BUREN'S WILL.

83 Pac. 530.

WILLS — MEASURE OF TESTAMENTARY CAPACITY.

Where testator understands what he is doing at the time of the execution of his will, and has full knowledge of his property and how he wishes to dispose of it among those entitled to his bounty, he has sufficient testamentary capacity, notwithstanding old age, sickness, debility of body or extreme distress.

From Marion : WILLIAM GALLOWAY, Judge.

Statement by MR. JUSTICE HAILEY.

This is a will contest, instituted in the county court of Marion County by Max O. Buren, only son of A. B. Buren, deceased, to have declared void the will of his father, for the reason, as stated in the petition, that his father at the time he signed the instrument in question was not of sound and disposing mind and memory, but was in his dotage, and suffering from disease, old age, and great physical and mental disability and infirmity, and his mind and memory were so impaired as to render him entirely incapable of making a will or of understanding the terms of any will or of making any valid disposition of his property, and that he never made or executed said pretended will, and did not intend that its provisions should take effect, and did not know or understand the contents thereof. At the hearing the will was sustained, but an appeal was taken to the circuit court, where a decree was entered setting aside the will, from which decree this appeal was taken by Leda V. Buren-Reeves, contestant's only sister, who was unmarried at the time of the death of their father. The father of these litigants had been a resident of Salem for many years, and died on February 24, 1904, leaving surviving him as his sole heirs the contestant, Max O. Buren, his son, aged about 34 years, and one daughter, Leda, aged about 19 years, who resided with her father, while her brother was married and had three young sons, and resided in a neighboring residence. At the time of his death the father was between

64 and 65 years of age, and had been afflicted for many years with what is commonly called "locomotor ataxia," and also with defective hearing. From 1890 to 1894 he was engaged in the furniture business in Salem with his son, Max, under the firm name of A. B. Buren & Son, but in the latter year he sold his interest to his son and a Mr. Hamilton, and thereafter loaned money and looked after his property interests, which were quite extensive, and at the time of his death aggregated about $35,000. During the winter of 1903–1904 his physical troubles so progressed as to confine him to his home, where, during the pleasant weather, he frequently sat in the front yard and chatted with his friends and neighbors as they passed.

In the month of February, 1904, he became confined to his house, and on the 16th day of that month sent for an attorney and gave him directions about drafting his will, and two days later the will was drawn at the residence of the testator in the presence of himself and three witnesses, and by him duly executed. By this will he gave certain residence property to his daughter and certain other like property to his son, and certain other real property to them jointly, and made a bequest of $2,000 to each of his three grandsons, the children of his son, Max. And "as a matter of kindly remembrance" made two small bequests, one for $250 to Mrs. Fannie Waln, a friend and former member of his household, and a like amount to Carolyn Holman, the infant daughter of Mrs. Rachel Holman, who was also a friend and at one time a member of his household; this latter bequest being made "on account of the many kindnesses bestowed on me and my family by her mother." The will further provided that the bequest made to his grandsons should not be paid to them until they had attained the age of 24 years, and he appointed their father as guardian of their funds, and directed that the same should be loaned to the best advantage and upon security

to be approved by the probate court of Marion County, Oregon, and that neither the principal nor interest thereon should be used, except to pay taxes and other public charges thereon.  The residue of his estate was willed to his daughter, Leda, and she was appointed executrix of his last will and testament, to serve without bonds.  This will was executed on the 18th day of February, 1904, in the presence of N. J. Judah, W. H. Holmes, and Mary Eliza Cotter, the trained nurse who was then attending him.  During his last illness Mr. Buren at times suffered great physical pain, to relieve which he was given morphine, and at times to allay his nervousness was also given bromide, which drugs had a depressing effect on him and caused more or less stupor.                                REVERSED.

For appellant there was a brief over the names of *W. H. Holmes*, *Webster Holmes* and *John H. McNary*, with an oral argument by *Mr. William Henry Holmes* and *Mr. McNary*.

For respondent there was a brief and an oral argument by *Mr. John A. Carson* and *Mr. A. M. Cannon*.

MR. JUSTICE HAILEY delivered the opinion of the court.

The only question involved upon this appeal is the testamentary capacity of the deceased at the time of the execution of the will.  It is contended on the part of the contestant that by reason of the morphine and other drugs administered to his father during his last illness, together with the progress of the disease from which he was suffering, he was not of sound and disposing mind and memory, and the instrument is therefore void.  To support this contention, the contestant relies almost wholly upon the opinion testimony of experts versed in mental disorders, only two of whom actually saw the testator during his last illness.  One of these called on the evening of the 17th of February, the day before the will was written, when the testator was in a stupor from the effects of morphine given

him during the day, and did not arouse him so as to have any conversation with him, while the other was his attending physician, who ordinarily made two calls a day, one in the morning and one in the evening, and was not present at the time of the execution of the will. The other expert witnesses based their opinions upon a reading of the testimony of these two. The appellant and proponent contends that her father was of sound and disposing mind and memory at the time of the execution of the instrument, and relies upon the testimony of the subscribing witnesses and of friends and acquaintances who saw and conversed with her father, both before and after the execution of the instrument.

We have carefully read and considered all the testimony in the record, and also inspected the original will, which was submitted for that purpose. The testimony of friends and associates of the deceased shows that he was a careful, prudent and capable business man, who kept close watch over all his affairs, and fully understood all his business dealings. The evidence also discloses that for some time prior to the execution of this instrument he had been talking about making a will, and had told former members of his household what he purposed doing with a part of his property, and after its execution again told at least two persons besides his daughter what disposition he had made of parts of his property by will, specifying the particular property and to whom it was given. On February 16, 1904, he sent for his attorney, Mr. W. H. Holmes, of Salem, whom he had frequently consulted in legal matters, and requested him to draw his will and gave him directions as to the disposition he desired to make of his property, all of which was noted down by his attorney, who returned the next day to draft the will, but, no witnesses being present, the matter was deferred until the following day, when N. J. Judah, a personal friend of the

deceased, was present to act as a witness, and also acted as scrivener in drafting the will, writing from dictation given him by Mr. Holmes, and in doing so sat near the testator, who was bolstered up in bed, and who, as testified to by Mr. Holmes, "paid very close attention to what was going on and interrupted me a time or two in some formal matters or unimportant matters, showing that he was paying very close attention to what I said." After the will was written it was carefully read to the testator by Judah in the presence of Mr. Holmes and Miss Cotter, the nurse. He then signed it and declared it to be his will, and requested the persons present to witness it as such, and after they had done so he asked his attorney, as testified to by the witness Judah, "if in the event of recovery from that illness, if the making and declaration of this will would hinder or prevent him from making any other disposition of his property, if he wanted to sell it, or anything else." His daughter, Leda, also testified that later on the same day he asked her to read the will, and when she had done so asked her if it was satisfactory, and "talked about it the next day" and "knew exactly what was in the will," and "mentioned each particular instance." Mrs. Rachel Holman, a friend and former member of the family, testified that in the evening after the will was made she heard the old gentleman and his son, Max, talking, and "heard Max say, 'Has Leda been any nearer and dearer to you that you should favor her.' The old gentleman was indignant, and he said: 'Max, don't you think I am in my right mind? Don't you think I know what I want to do with my property?' He seemed to be angry because Mr. Buren was trying to impress upon him that he was as dear to him as Leda." She further testified that on the morning following the execution of the will she called and conversed with Mr. Buren, and he mentioned the bequest of $250 to her baby, Carolyn, and asked her to remind the child of the bequest,

and that it came from him, whenever she was old enough to appreciate it.

The only testimony given by the contestant himself regarding his father's physical and mental condition is the following:

"Q. Did you see your father during his last illness or shortly preceding his death?
A. I saw him during his sickness; yes.
Q. State to the court the condition of his hearing, and confine your testimony solely to that one matter.
A. My father's hearing was always bad, and he was very inattentive, making it harder for him to hear a person than one who had the same hearing. At a number of times I noticed that when it came to giving his medicine that Miss Cotter had to talk very loud to him, and I had to talk loud to him, and had to repeat it a number of times. It was practically impossible to carry on an extended conversation with him.
Q. What was the reason of that?
A. He was dull; his mind seemed dull.
Q. I mean about his hearing?
A. Well, the reason that it was so hard to carry on a conversation with him was because his hearing was so hard, and he did not look directly at you, and he had a poor conception of the reading of one's lips if he did look at you."

He does not contradict the testimony of Mrs. Holman or attempt to detail the mental condition of his father, although he visited and talked with him on the day the will was signed and on the preceding day, and saw him a number of times during his last sickness.

Personal friends, who had been acquainted with him for years and who visited with him both before and after the execution of the will, testified that they found him suffering physically, but that his mind was clear, and he talked rationally about business and other matters and was in his normal mental condition, which was that of a careful

and cautious man of good business capacity. Holmes and Judah, the subscribing witnesses, both testified that his mind was perfectly clear when the will was drafted and executed, and the attending circumstances as detailed by them and the nurse, together with the testimony of other witnesses who saw him before and after the execution of the will, fully establish the fact that he understood what he was doing at the time he executed the will, and had full knowledge of his property and how he wished to dispose of it among those entitled to his bounty, and this was "sufficient testamentary capacity, notwithstanding his old age, sickness, debility of body or extreme distress," within the rule now firmly established in this State and recently reiterated by Mr. Justice MOORE in the case of *Ames' Will*, 40 Or. 495–504 (67 Pac. 737), where all the decisions of this court upon this subject are collated.

The decision of the circuit court will therefore be reversed, and this cause remanded for such further proceedings as may be proper, not inconsistent with this opinion.

REVERSED.