Argued February 20, reversed and remanded with directions
March 7, 1951

# IN THE MATTER OF THE ESTATE OF MARY SCOTT, Deceased.
## TROMBLY ET AL. v. McKENNEY, EXECUTOR, ET AL.

228 P. 2d 417

*W. C. Winslow,* of Salem, argued the cause for proponents-appellants. With him on the brief was Norman K. Winslow, of Salem.

*Ralph E. Moody,* of Salem, argued the cause for contestants-respondents. On the brief were Moody & Lamkin, of Salem.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, WARNER and TOOZE, Justices.

TOOZE, J.

This is a proceeding to contest the will of the late Mary Scott, who died at Salem, Oregon, on July 31, 1948, at the age of 79 years. The contestants are Frank Trombly, a brother, Maggie Meier, a sister, Claude McKenney, a nephew, and Maggie McKenney Clark, a niece, of decedent. The proponents are Wade F. McKenney, a nephew of decedent, and Hazel McKenney, his wife, who are chief beneficiaries under the will. The defendants are Clara Scott, a sister-in-law, and William Marlatt, a grandnephew, of decedent, and Edward Hobart, sexton of Miller Cemetery, named as legatees in said will.

On August 6, 1948, Frank Trombly and Maggie Meier filed their petition in the circuit court for Marion county for the appointment of Maggie Marlatt, a niece of decedent, as administratrix of the estate of Mary Scott, deceased; it being alleged in said petition that Mary Scott died intestate. Though the original records sent to this court fail to disclose any action by the trial court upon this petition, nevertheless, in other records connected with this contest it is stated that Maggie Marlatt was appointed administratrix and that letters were issued her in that behalf.

On August 24, 1948, by virtue of a petition filed by Wade F. McKenney, the said circuit court admitted to probate in common form, as the last will and testament of Mary Scott, deceased, a written instrument dated March 17, 1948, and ordered that the letters of administration theretofore issued to Maggie Marlatt be revoked and appointed Wade F. McKenney as executor to serve without bond.

On December 22, 1948, contestants filed in said court their petition contesting said will on the grounds (1) that at the time of the execution thereof said dece-

dent was mentally incompetent and hence lacked testamentary capacity, and (2) that said will was the result of undue influence exercised over decedent by Wade F. McKenney and Hazel McKenney, his wife. The proponents joined issue on the petition and prayed a decree admitting said will to probate in solemn form and continuing said Wade F. McKenney as executor thereof.

A hearing was held, and thereafter, on July 7, 1949, the trial court made and entered its decree (1) setting aside the prior order of the court admitting said will to probate and decreeing said will to be null and void on the ground that at the time of the execution thereof the said Mary Scott was of uncertain and unsound mind and mentally incompetent and had no testamentary capacity to make said will or any will whatsoever; (2) annulling, cancelling, and revoking the appointment of Wade F. McKenney as executor and directing him to account; and (3) that the letters of administration theretofore issued to Maggie Marlatt as administratrix of the estate of Mary Scott, deceased, be reinstated and reissued to her and that the said Maggie Marlatt continue as administratrix of the said estate. From this decree, proponents appeal.

At the time of her death as aforesaid, the said decedent left an estate consisting of real and personal property of the approximate value of $14,000. Her heirs-at-law and next of kin were Frank Trombly, a brother, Maggie Meier, a sister, Wade F. McKenney, a nephew, Claude McKenney, a nephew, and Maggie McKenney Clark, a niece. Wade F. McKenney and Claude McKenney are brothers, and Maggie McKenney Clark is their sister.

By the will in question the testatrix bequeathed $300

to Miller Cemetery Association in trust to pay the sexton for the care of her grave and that of her deceased husband at the rate of $10 per year, the sum of $300 to her sister-in-law, Clara Scott, and the sum of $100 to her grandnephew, William Marlatt, a minor. The rest, residue, and remainder of her estate she devised and bequeathed to her nephew Wade F. McKenney, and, in the event of his death, to his wife, Hazel McKenney, "in gratitude and appreciation of the many kindnesses done to me during my lifetime."

During her lifetime, Mary Scott formerly lived on a farm in Ankeny Bottom in Marion county. She was the second wife of William Howard Scott, who predeceased her. She had no children. About 1940 or 1941, according to Margaret (Maggie) Marlatt, a niece, Mary Scott suffered a very serious illness involving the lungs and heart. Up to that time, according to the witness, she had been quite active, was neat in her personal appearance and housekeeping, and mentally keen. In 1942 or 1943, according to Claude McKenney, decedent sold her farm in Ankeny Bottom and went to live with her brother and sister, Frank Trombly and Maggie Meier. She remained there until October, 1945, when she moved to Salem into a home purchased by her and located on Adams street near the baseball park. Her next-door neighbors were E. C. McCandlish, a livestock buyer, and Esther McCandlish, his wife. Mary Scott lived alone in her Salem home, doing her own housekeeping, raising a few chickens, and putting in and tending her own garden.

In January, 1946, Mary Scott wrote her nephew Claude McKenney, advising him of her whereabouts and asking him to call, which he did. Up to this time, Claude McKenney's visits to his aunt had been very

infrequent. During the remainder of the year 1946 and most of the year 1947, Claude McKenney, who lived near Salem, more or less looked after Mrs. Scott. He bought groceries for her, got wood for her use, paid divers bills, such as those for light, water, taxes, etc., but in every case the necessary funds therefor were advanced by Mary Scott, sometimes in cash and other times by check. She did her own banking business.

During the time Claude McKenney was assisting the decedent, she constantly complained to him that her relatives had mistreated her, specifically mentioning her brother and sister and Maggie Marlatt. She also made similar complaints to her sister-in-law Clara Scott, and to others. The record does not disclose what this mistreatment consisted of, though she did accuse some of her relatives of taking articles of personal property of trivial value belonging to her.

According to Claude McKenney, the testatrix often mentioned to him her desire to execute a will so that she might prevent certain of her relatives realizing anything out of any estate she might leave at the time of her death. He finally took her to see L. H. McMahan, an attorney of Salem, and formerly a judge of the circuit court, who had been intimately acquainted with William H. Scott during his lifetime. Upon several occasions, Judge McMahan discussed with decedent the matter of executing a will. According to him, decedent was very changeable in her ideas. He said that she would designate certain persons to be named as legatees and the several amounts of cash she wished to provide for them and then change her mind as to persons and amounts before he could prepare the will. Judge McMahan seemed to be of the opinion that this conduct on the part of decedent was a strong circumstance show-

ing mental incompetency. Evidently, Judge McMahan overlooked the fact that to "change her mind" has long been considered one of woman's inalienable rights—a prerogative she has never yet willingly surrendered. At that time it seemed to be the desire of decedent to name Claude McKenney and Clara Scott as the principal beneficiaries under her will.

During his discussions with decedent, Judge McMahan visited her home, noted its cluttered-up condition, and also decedent's own mode of living. He urged her to spend her money upon herself instead of leaving it for others to enjoy after her death. He testified that he said to her:

> "Mary, this won't do, * * * You have $14,000.00, you say; you have plenty to keep you in comfort. What is the use of trying to save it and let somebody else spend it. * * * You could go down to a beauty parlor and have your hair trimmed, have a shampoo and one of those fancy hair-does, and get you some clothes. * * * Get you a place to live and get out of this mess up here and see a moving picture and go calling and get out and enjoy life."

What effect this advice had upon this miserly old lady is unknown. But in any event, a careful perusal of the entire testimony of Judge McMahan shows that during his interviews with decedent, she knew who her relatives were, what her property consisted of, and what she wanted done with it by will, even though she changed her mind from time to time as to the persons she wished to favor. However, Judge McMahan was unable to get the final data as to just what she wanted in her will, and he gave up trying to write one for her. But all this took place several months prior to the time the will here involved was executed.

During the period of time Claude McKenney was

looking after his aunt, he agreed with her upon one occasion that he would construct a house on her premises, and she advanced $250 to him for that purpose. He states that he purchased lumber with this money, but he failed to build the house, return the money, or account for the lumber which he said he yet retained in his possession. He also made another agreement with his aunt to do some repair work for her at a price of $25 to $40. He failed to keep this agreement.

Claude McKenney was one of the witnesses who expressed it as his opinion that testatrix was mentally incompetent to execute a will in March, 1948. Yet, in testifying to the transaction respecting the deal about the house to be built, he said:

"Q. * * * September 4, 1947, when you made this deal with her about the house, you thought she had sufficient mentality to transact business then, didn't you, Mr. McKenney?

"A. Not too much.

"Q. Well, you were looking after her affairs, weren't you?

"A. Yes.

"Q. More or less of a confidential relationship existing between you?

"A. That is right.

"Q. You thought she was competent to represent herself in a deal with you?

"A. That is right.

"Q. Involving the expenditure of money?

"A. Yes."

In March, 1947, Mary Scott became ill and was taken to the Deaconess hospital in Salem, and from there she went to a convalescent home, where she remained until April 17 and then returned home. She remained at home until October, 1947, when she again became ill and was taken to the Salem General hospital. From

there she went to another convalescent home, where she remained until about November 1, when she again returned home. She then remained at home until the latter part of June, 1948, when she again became seriously ill and was removed to a convalescent home where she died on July 31. Her illness was due in each instance to a heart and lung condition.

Wade F. McKenney and his wife had visited Mary Scott upon different occasions, and he had advised his aunt if he could ever be of help to her he would be glad to assist. Claude McKenney testified that after visits to his aunt by Wade McKenney and his wife, Mrs. Scott told how glad she was that they had been there to see her.

About October 11, 1947, and while she was in the Salem General hospital, Mary Scott expressed to her sister-in-law, Clara Scott, a desire that Wade McKenney, who lived at Tigard and was a regular member of the Portland fire department, be sent for. Clara Scott delivered this message, and Wade and his wife immediately went to Salem. After Wade saw and talked with his aunt, it was decided between them that owing to her poor health and consequent inability to carry on her own affairs, Wade should be appointed conservator of her and her affairs. On October 16, 1948, pursuant to the petition of Mary Scott, Wade F. McKenney was appointed by the circuit court for Marion county as conservator of her and her affairs and gave bond for the faithful performance of his duties in that respect. From then until the death of Mary Scott, Wade F. McKenney served as conservator.

When Mrs. Scott was returned to her home from the convalescent home on or about November 1, 1947, Wade employed a woman to live in the home with his

aunt and care for her. This continued for about a month when Mrs. Scott, being dissatisfied, discharged this employe. Shortly thereafter, Wade made arrangements with Mrs. McCandlish, the neighbor, to look after his aunt, paying her at the rate of $1 per day. Mrs. Mc-Candlish was to look in on Mrs. Scott each morning and see that she had at least one good meal a day.

In passing, it might be noted that for quite a period of time before that Mrs. McCandlish had shown a kindly and neighborly interest in Mrs. Scott and had more or less looked after her, wholly without compensation. At the suggestion of Mrs. McCandlish, Mrs. Scott was not advised of the new arrangement providing compensation for the services rendered by this neighbor.

After his appointment as conservator, Wade Mc-Kenney visited his aunt at least once each week, his wife usually accompanying him. Mrs. McKenney had had considerable experience as a nurse, both ·before and after her marriage to Wade. Sometimes, Mr. and Mrs. McKenney would stay with Mrs. Scott for the day, and frequently they would remain overnight.

Clara Scott was one of the witnesses called by proponents. She and Mary Scott for many years had been very intimate friends and were nearly of the same age. Over the years the two had frequently visited with each other, and after Mary Scott moved to Salem, Clara visited her very often, not only in her home, but also in the hospitals and at the convalescent homes when Mary was confined there by illness.

It also appears from the record that after the appointment of Wade McKenney as conservator, Claude's visits with his aunt became very infrequent, and no other members of her family visited her except upon

rare occasions. There is no evidence that her brother and sister ever visited her in Salem.

Upon the many occasions that Wade McKenney and his wife were in the home of Mary Scott, she complained to them, as she had to Claude McKenney and others, about the mistreatment accorded her by certain of her relatives, and she indicated a firm purpose on her part to see that they did not participate in any estate she might leave upon her death. Wade advised her that her mere talking would not accomplish her purpose and that it would be necessary for her to put down on paper what she wanted. She suggested that he take her to an attorney, but owing to her poor physical condition, Wade stated that he would have an attorney come to the home to see her instead. Wade then interviewed John Carson, who had acted as his attorney in the conservatorship matter. Mr. Carson expressed his opinion that inasmuch as he had acted as attorney in that proceeding, and it was indicated that the testatrix intended to leave the bulk of her estate to Wade, he should refrain from drawing the will in question and suggested another attorney. This action was in accordance with the high ethical standards of the legal profession.

Wade McKenney then contacted Otto K. Paulus, a Salem attorney and a stranger to him. Paulus went to decedent's home, interviewed her for about three-quarters of an hour, and from her alone secured the data necessary for the preparation of the will. Neither Wade McKenney nor his wife participated in this discussion, nor were they, or either of them, present during the same. Inasmuch as what occurred at this meeting between Paulus and decedent is very important in determining the testamentary capacity of testatrix at that

time, we quote briefly from the testimony of Paulus as follows:

"Q. First, did you make a call to get the data to write the will?

"A. I got the data and prepared the will, had it typed.

"Q. Where did you see Mrs. Scott to get the data?

"A. At her home, just close to the ball park.

\* \* \*

"Q. And how long did you talk to her for the data?

"A. I would say probably three-quarters of an hour.

"Q. What did she tell you?

"A. She told me she was ready to draw her will and we went into the discussion as to whom should have what property, what she was going to give to each of them.

"Q. Did you discuss with her the property she had?

"A. Yes, only in a casual way. She mentioned she had a bank account and she owned the house and lot. I didn't go into the matter of amounts or value of it.

"Q. I believe the inventory shows she had a piece of property in the eastern part of the state.

"A. It wasn't mentioned in any way.

"Q. Any discussion about her relatives?

"A. Only incidental to the drawing of the will.

"Q. Did she tell you who they were?

"Oh, yes, she went over most of them; not all of them.

"Q. What did she say about what she wanted to give them?

"A. She mentioned William Marlatt and wanted to give him $100.00, and she mentioned Clara Scott and said she wanted to give her $500.00, and she said she wanted to give the rest of the property

to her nephew, Wade McKenney. A good deal of the time was spent in discussing where she wanted to be buried and the arrangements for taking care of the graves after her death.

"Q. What did she say about that?

"A. She wanted it so arranged that the graves would be taken care of indefinitely.

"Q. Where did she tell you she wanted to be buried?

"A. In the cemetery north of Silverton. I believe it was the Cox Cemetery.

"Q. And did she give any instructions with reference to how she wanted the graves cared for?

"A. None other than that she wanted a certain amount of money set aside—$300.00—to take care of the graves.

"Q. Did she have any suggestions on handling that?

"A. No. I suggested we put it in a trust fund with a trust company.

"Q. What did she say with reference to that?

"A. That was agreeable to her.

"Q. Was there any discussion about giving some of the other relatives some portion of her estate?

"A. Yes, she went over several of the other relatives and I asked her particularly if she didn't want to leave something to Maggie Marlatt.

"Q. What did she say to that?

"A. Her face hardened and she said 'no'. I didn't pursue the matter any further, because obviously her mind was made up."

Before preparing the will, Paulus contacted the Pioneer Trust Company, of Salem, with reference to handling the trust fund for the care of the graves and was advised that the cost of the trust would be more than the interest on the $300. He then contacted the cemetery association in Silverton and discussed the

matter with them, and it was finally agreed that the fund should be left to the cemetery association in trust to use as much of the interest and corpus as was necessary to pay $10 a year for the upkeep of the two graves.

After preparing the will, Paulus returned to the home of the testatrix, accompanied by one Robert E. Rawson, who was to act as one of the witnesses. This was about two days after Paulus' first visit. He read the will to Mrs. Scott in the presence of Rawson, but out of the presence and hearing of Wade McKenney and his wife. He explained the change in plan about the administration of the trust fund for the care of the graves, and that was satisfactory to testatrix. Mrs. Scott directed that one change be made. She had told Paulus to provide $500 for Clara Scott, but asked that this be changed to $300, which was done. She then signed the will in the presence of the two witnesses, and Paulus and Rawson, in her presence, and in the presence of each other, affixed their signatures as witnesses.

On further questioning, Paulus testified as follows:

"Q. At the time that will was executed and at the time you talked to her with reference to the data you obtained for the purpose of preparing the will, I will ask you whether or not Mary Scott had testamentary capacity?

"A. She did.

"Q. And as to whether or not she knew her relatives?

"A. Yes.

"Q. And what property she had?

"A. I believe she did.

"Q. Did she have a rational reason for disposing of her property as she disposed of it?

"A. Yes, she did.

"Q. How long did you discuss with her the rea-

sons for disposing of the property as it was disposed of?

"A. Not at any great length. It seemed to me obvious that she knew what she wanted to do. She mentioned the kindness of her nephew, Wade McKenney, and that is the extent of that. As to the other bequests, I didn't attempt to determine."

Rawson corroborated the testimony of Paulus with respect to the competency of testatrix at the time the will was executed. Clara Scott, who saw testatrix a day or so before March 17, also testified that in her opinion Mrs. Scott was then competent to make a will. Both Mr. and Mrs. McCandlish, the neighbors, testified to the same effect, as did Wade McKenney and his wife.

The evidence is quite conclusive that testatrix was extremely penurious and, during the later years of her life, was very neglectful of her person, dress, and housekeeping. She owned more furniture than her small home would accommodate and, as a result, it always presented a cluttered-up appearance. That she was eccentric to a marked degree cannot be doubted.

However, after a very careful review of the entire record and noting all the incidents claimed by the witnesses as indicating competency or incompetency, as the case might be, we have arrived at the definite conclusion that on March 17, 1948, when this will was executed, the testatrix knew exactly what she was doing and possessed testamentary capacity. It is true that physically and mentally she was far from the woman she had been some years before, but she lacked much of being of unsound mind and incompetent to make a will.

In arriving at this conclusion we have given considerable weight to the unbiased testimony of the attorney who prepared the will and attended its execution,

and to that of the neighbors, Mr. and Mrs. McCandlish, who were perhaps closer to decedent than any other persons outside the family and hence in an excellent position to judge her. They saw and visited with her practically every day over a period of three years immediately prior to the execution of this will, excepting only when she was confined in a hospital or convalescent home. In this proceeding these witnesses had no axe to grind and no motive for testifying other than truthfully.

■ One is not rendered incompetent to execute a will simply because he or she may be slovenly, parsimonious, and eccentric. In modern times, the late Hetty Green, once the world's richest woman, perhaps offered the best example of such a person, yet it is doubtful if anyone would have questioned her testamentary capacity at any time up to the very moment of her death.

In 1 Page on Wills, 303, § 148, the rule is stated thus:

"Eccentricity has no effect on testamentary capacity; and the wills of persons who are highly eccentric, and in some cases eccentric to the verge of insanity, have been upheld. * * * The fact that the testator was filthy, forgetful, and eccentric, or that he was miserly and filthy * * * or that he was filthy, frequently refused to eat, and would lie in bed with his clothes on * * * or that he was inattentive * * * does not establish lack of capacity."

See also 68 C. J., Wills, 437, § 34.

The rules for determining the testamentary capacity of one executing a will are firmly established in this state by a long line of decisions by this court. It is unnecessary to review those authorities.

 It is established that the burden of proof rests upon the proponent of the will to show that the testator had testamentary capacity at the time he executed his will. However, if it is shown that the testator at the time he executed his last will understood the business in which he was engaged and had a knowledge of his property and how he wished to dispose of it among those entitled to his bounty, then he had sufficient testamentary capacity, even though he may have been advanced in age, sick, debilitated in body, or in extreme distress. Although the burden of proof rests upon the proponent, yet there is a presumption in favor of the sanity of every testator. *Morley et al. v. Silverton Hospital,* 138 Or. 75, 5 P. 2d 92; *In re Will of Robert Carr,* 121 Or. 574, 256 P. 390; *In re Estate of Riggs,* 120 Or. 38, 241 P. 70, 250 P. 753; *Re Phillips' Will,* 107 Or. 612, 213 P. 627; *Holman's Will,* 42 Or. 345, 70 P. 908.

 In every case where the question arises, the final test is whether the testator possessed testamentary capacity *at the time the will was executed.* It is immaterial that he may have been incapacitated at a time prior or subsequent thereto, though evidence of such incapacity is always admissible for consideration in determining capacity at the time of execution of the will. Even an insane person may have testamentary capacity during a lucid interval. 68 C. J. Wills, 437, § 31. Inasmuch as the vital question to determine is that of competency at the very time the will is executed, testimony of persons who had occasion to observe the testator at or near that time is of much greater weight than that of other persons testifying to times and occasions more remote. The witnesses called by contestants to testify in this case did not have the oppor-

tunities for observation of testatrix at or about the time the will was executed, as was the case of the principal witnesses produced by proponents, and hence greater weight must be given the testimony of the latter. Particularly is this true of those witnesses who were wholly disinterested, such as the subscribing witnesses to the will.

■ *In re Will of Robert Carr,* supra, this court, at page 580, stated:

> "In determining the mental capacity of the testator at the time of making the will *great weight is to be given to the testimony of the subscribing witnesses.* They have the opportunity to observe the mental condition and all the surrounding circumstances at the time of the execution of the will: * * * ." (Italics ours.)

Having determined that the testatrix possessed testamentary capacity at the time she executed her last will and testament, there remains for consideration only the charge that her will was the result of undue influence exercised upon her by proponents.

■ The burden of proof of undue influence is usually upon the party who asserts it. However, there are some exceptions to this rule. In *Allen v. Breding,* 181 Or. 332, 181 P. 2d, 783, this court, at page 341, said:

> "The existence of a confidential relationship between testator and beneficiary, however, *coupled with proof that the beneficiary participated actively in the preparation or execution of the will,* casts upon the beneficiary the burden of disproving undue influence." (Italics ours.)

Contestants seek to invoke this doctrine in this case. It may be conceded that a fiduciary relationship existed between Wade McKenney and the testatrix; yet under the facts of this case, the rule is not applicable.

There is no evidence in this case that either Wade McKenney or his wife actively participated in the preparation or execution of the will in question. The record discloses precisely the opposite. The only part either Wade McKenney or his wife took in connection with the preparation and execution of the will was the arrangement Wade made with Paulus to call upon testatrix. Proponents did not give the attorney any information as to any disposition testatrix wished to make of her property, and both properly refrained from being present while Paulus discussed the terms of the will with testatrix, as well as during the time the will was being executed. So far as the record discloses, the only suggestion that Wade McKenney or his wife ever made to testatrix in connection with the disposition of her property was the sound advice that she should put in writing what she kept telling them, and had told others, she wanted done.

The record is devoid of any evidence whatever that proponents either advised, suggested to, solicited, or urged testatrix to dispose of her estate in any particular manner or in favor of any particular individuals.

On oral argument in this court, counsel for contestants made the assertion that after his appointment as conservator, Wade McKenney would not permit anyone to go near testatrix, and that he kept her constantly under his complete dominion and control. Yet the evidence conclusively shows that for at least five days of each week testatrix lived alone in her home, and neither Wade McKenney nor his wife were anywhere near. During all this period of time, Wade McKenney, as a member of the Portland fire department, had his official duties to perform. He went to Salem only on those days when his duties did not

require his presence in Portland in connection with his employment.

The great preponderance of the evidence shows that Wade McKenney was very conscientious and careful in the performance of his duties as conservator and was kind to and considerate of the testatrix even beyond the line of duty.

■ Though in view of the fact that Wade McKenney and his wife did not actively participate in the preparation or execution of the will, and, therefore, the rule announced in *Allen v. Breding*, supra, as to the burden of proof, has no application here; nevertheless, even assuming they had the burden of proving the absence of undue influence, that burden was fully met and discharged.

The evidence is undisputed that for several years immediately prior to her death and long before Wade McKenney was appointed conservator, the testatrix entertained ill feelings toward her brother and sister, whether such feelings were justified or not. She definitely did not intend that they should receive anything out of her estate. For a time she did feel very kindly toward Claude McKenney, and there is little doubt but that there was a time she had it in mind to make him one of the chief beneficiaries under her will. The record does not disclose why she changed her mind, but it is significant to note that she ceased relying upon Claude McKenney and sent for his brother Wade a very short time after the house and repair transactions occurred between her and Claude. Whether Claude's failure to carry out his agreements caused the testatrix to change her mind as to him is not known, but considering her nature and disposition, that is a reasonable explanation of her conduct. In all her conver-

sations with Claude McKenney, with Judge McMahan, and with Wade McKenney and others, when speaking of making her will, testatrix always mentioned Clara Scott and William Marlatt among those she wished to favor, and she also discussed a provision for the upkeep of the graves of herself and husband.

▆▆▆ *In re Will of Robert Carr,* supra, this court stated the following rules of law:

> "In order to show undue influence sufficient to set aside a will, it must be shown that the influence was such as to overcome the free volition or conscious judgment of the testator, and to substitute the wicked purpose of another instead, and it must be the efficient cause without which the disposition would not have been made: In re Diggins' Estate, 76 Or. 341, 346 (149 Pac. 73); In re Darst, 34 Or. 58, 65 (54 Pac. 947); In re Turner's Will, 51 Or. 8 (93 Pac. 461).

> "It is not enough to show that the parties accused had an opportunity to exercise influence but it must appear that the influence was actually exercised and that it was exerted to such an extent that the resulting will was not that of the testator, but that of the party or parties procuring its execution. Mere suspicion of undue influence is not sufficient: Rice v. Rice, 95 Or. 559, 563 (188 Pac. 181); In re Sturtevant's Estate, 92 Or. 296, 300 (178 Pac. 192, 180 Pac. 595); Turner's Will, 51 Or. 8 (93 Pac. 461).

> "Friendly advice or influence arising from gratitude, affection or esteem is not undue influence, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed: Estate of Allen, 116 Or. 467, 499 (241 Pac. 996).''

See also 68 C. J., Wills, 743, § 436.

In 68 C. J., Wills, 750, § 439, it is stated:

"Influence arising from mere acts of kindness, attention, and congenial intercourse, which operate to secure or retain the affection, esteem, or good-will of the testator, and induce him to make the persons performing such kindly offices beneficiaries in his will, do not constitute undue influence, unless such acts are carried out with the purpose and design of subjecting the mind of the testator to the influence and direction of the person exercising the influence, and thus deprive the testator of his free will, free act, and free agency. The application of this rule is not confined to relatives of the testator, but extends also to his friends."

There is nothing unnatural about the way in which the testatrix disposed of her estate by her will. She remembered those who were kind to her and who were most entitled to her love and affection.

To sustain the charge of undue influence in this case it would be necessary for us to accept in lieu of substantial evidence mere suspicion, innuendo, insinuation, and speculation. The last will and testament of a deceased person is an instrument of such great solemnity that it will never be set aside unless the evidence is convincing that it should be. In this case the charge of undue influence has wholly failed of proof. In this connection it is significant to note that the trial court who heard the witnesses and observed their conduct and demeanor while under examination made no finding of undue influence.

It follows that the decree of the trial court is reversed, and this cause is remanded with directions to admit the said last will and testament of testatrix executed March 17, 1948, to probate. None of the parties shall recover costs in this court.