Argued February 28, affirmed May 15, 1957

In the Matter of the Estate of Jessie Aaltje

Harritt, Deceased

HARRITT *v.* LINFOOT, Executor et al

311 P. 2d 450

*Joseph P. Meier,* of Salem, argued the cause and filed a brief for appellant.

*Samuel F. Speerstra,* of Salem, argued the cause for respondents. On the brief were Rhoten, Rhoten & Speerstra, of Salem.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and KESTER, Justices.

BRAND, J.

In this contest Karl Wright Harritt, brother and sole heir at law, seeks to invalidate the will of Jessie Aaltje Harritt on the grounds of lack of testamentary capacity and undue influence alleged to have been exerted by Edith Bynon Low, with the assistance of Estella M. Bynon, beneficiaries under the will. Contestant appeals from a decree of the circuit court dismissing the contest, and admitting the will to probate in solemn form.

Jessie Aaltje Harritt died in Salem on 23 July 1953 at the age of 66 years. She left a will dated 24 June 1953, duly executed in the presence of Thomas A. Pickett and Lilajean Farris, the attesting witnesses. William J. Linfoot, decedent's attorney, was named executor. The beneficiaries named in the will were

Estella M. Bynon, who received certain property in Polk County owned by decedent, and an equal share of the residue; Berna Ames and Karl Wright Harritt, each of whom received a bequest of $1,000; and Edith Bynon Low, who shared equally in the residue with Estella M. Bynon. The will was admitted to probate in common form on 5 August 1953, and William J. Linfoot was appointed executor. On 25 January 1954 contestant filed his petition contesting the will for probate, alleging that on or about 24 June 1953 decedent was not of sound and disposing mind and was not competent to make a last will and testament. He further alleged, in part, as follows:

"That for a long period of time prior to said dates, said decedent was addicted to the use of alcoholic liquor and was a chronic user thereof; that such habitual use of alcoholic liquor continued until said decedent was on the point of death and left sick and unsound in mind and body requiring hospitalization and medical attention; that on or about the 21st day of March, 1953, your petitioner caused said decedent to be admitted to a private sanitarium for the purpose of curing said decedent from such addiction to the use of alcoholic liquor; that on or about the 28th day of March, 1953, defendants, Edith Bynon Low and Estella M. Bynon, caused said decedent to be removed from such sanitarium to said defendants' residence in Salem, Oregon; that at such time decedent was an invalid and unable to procure alcoholic liquor; that defendants, Edith Bynon Low and Estella M. Bynon, induced decedent to leave said sanitarium and to make such move by promises to keep said decedent supplied with alcoholic liquor; that such movement was made without the knowledge of the persons in charge of such sanitarium or any of said decedent's family; that defendants, Edith Bynon Low and Estella M. Bynon, kept said decedent well supplied with alcoholic liquor from said date of March 28, 1953, until

the aforesaid date of decedent's death in their said residence for the purpose of inducing decedent to execute said will; that during such period of time from March 28, 1953, to the date of decedent's death, said decedent was enslaved by her aforesaid addiction and was rendered completely pliable to the will of said defendants, Edith Bynon Low and Estella M. Bynon, by their promises to supply decedent with alcoholic liquor, by their performance of such promises and by their threats to cease performance of such promises; that on the 24th day of June, 1953, said decedent being so pliable to the will of said defendants, being fearful lest her source of supply of alcoholic liquor be severed and being thoroughly cowed and intimidated by said defendants, Edith Bynon Low and Estella M. Bynon, was induced and influenced by said defendants to sign said document dated June 24, 1953, thereby substituting the will and testamentary wishes of defendants, Edith Bynon Low and Estella M. Bynon for her own; and that said defendants, Edith Bynon Low and Estella M. Bynon, were present at the time said decedent signed said document dated June 24, 1953, and were active in the execution thereof by gathering the witnesses to said document and by urging and persuading said decedent to sign said document dated June 24, 1953.''

By reason thereof it was alleged that the will dated 24 June 1953 was not the last will and testament of the decedent, ought not be admitted to probate, and that decedent died intestate, and relief was prayed for accordingly. Proponent's answer was a general denial.

Decedent was a spinster, employed until her retirement in October, 1952, by the State of Oregon. During her earlier years she resided in Salem in a house on 17th Street with her mother, and after May, 1941 with Miss Berna Ames, who came as a companion to her mother. When the mother was committed to the

state hospital in June, 1947, decedent moved to a cabin on her Polk County property, and Miss Ames moved to Washington. After decedent retired she became ill and was taken to a hospital, one of four trips she thereafter made, and from there she was taken to the Boice nursing home, where she remained from 21 March to 28 March 1953. When she was removed from the nursing home she was taken to the Bynon home by Mrs. Low, and from there to her Polk County property by Miss Ames, who had returned in April to care for decedent. She remained with Miss Ames, either at the Polk County place, or in a house in Salem, most of the time from Miss Ames' return until 20 July. Decedent made further trips to the hospital, and finally was taken to the Bynon home about a week or ten days before the will was signed, and where she spent the remaining days of her life.

██ The burden of proof is on the proponent of a will to prove the testamentary capacity of the testator. *In re Carr's Will,* 121 Or 574, 256 P 390; *In re Linville's Estate,* 137 Or 145, 300 P 505; *In re Bond's Estate,* 172 Or 509, 143 P2d 244; *In re Southman's Estate,* 178 Or 462, 168 P2d 572; *In re Hill's Estate,* 198 Or 307, 256 P2d 735. A testator possesses sufficient testamentary capacity when he understands the business in which he is engaged, has knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, notwithstanding his old age, sickness, debility of body or extreme distress. *In re Diggens' Estate,* 76 Or 341, 149 P 73; *In re Sturtevant's Estate,* 92 Or 269, 178 P 192; *In re Scott's Estate,* 191 Or 90, 228 P2d 417; *Buren's Will,* 47 Or 307, 83 P 530; *In re Knutson's Will,* 149 Or 467, 41 P2d 793.

██ In determining the capacity of the testator at the time of making the will great weight is given to the

testimony of the subscribing witnesses who had the opportunity to observe the testator's mental condition and all the circumstances at the time of the execution of the will. *In re Fredrick's Estate,* 204 Or 378, 282 P2d 352; *In re Beer's Estate,* 190 Or 15, 222 P2d 1005; *In re Carr's Will,* 121 Or 574, 256 P 390. Both subscribing witnesses, Thomas A. Pickett and Lilajean Farris, testified that decedent was of sound and disposing mind. Mrs. Farris testified that decedent was nervous and physically ill and looked weak and tired, but that she was mentally well. In addition, there was the testimony of Dr. E. P. Greenwood, decedent's physician, who testified that at the times he saw her on 22 June and 29 June 1953 she seemed quite clear mentally, and that during that time he believed her mind was in such condition that she would know the natural objects of her bounty, what property she might own, and what she wanted to do with it, and that her mind was in such condition that she could decide these things for herself. Contestant produced nothing to the contrary. The evidence shows that testatrix did have sufficient testamentary capacity to execute a will on 24 June 1953.

■■ On the issue of undue influence, the burden of proof rests on the contestant. *In re Southman's Estate,* 178 Or 462, 168 P2d 572; *In re Lobb's Will,* 173 Or 414, 145 P2d 808; *In re Knutson's Will,* 149 Or 467, 41 P2d 793; *In re Allen's Estate,* 116 Or 467, 241 P 996; *Rice v. Rice,* 95 Or 559, 188 P 181. However, a confidential relationship between the decedent and the beneficiary coupled with the fact that the beneficiary took an active part in the execution of the will, or other suspicious circumstances may create a suspicion of undue influence, requiring the beneficiary to come forward with evidence sufficient to overcome the adverse inference. *In re Perry's Estate,* 181 Or 332, 181 P2d 783; *In re South-*

*man's Estate,* 178 Or 462, 168 P2d 572; *In re Lobb's Will,* 173 Or 414, 145 P2d 808; *In re Dale's Estate,* 92 Or 57, 179 P 274. It is then necessary to examine the eight alleged suspicious circumstances to which contestant calls attention. The first two circumstances which he contends arouse suspicion are unnatural disposition and sudden change of testamentary intent; and the mention of a disliked brother in the will and the exclusion of a favorite niece theretofore considered by testatrix as a natural object of her bounty. Three wills prior to the one in question were introduced in evidence. A copy of the first, dated 25 October 1940, was found in Mr. Bynon's papers on his death. It provided for a bequest of five dollars each to decedent's niece Marjorie Maerz (now Witzel) and decedent's nephew Delbert Harritt. Decedent's house on 17th Street was devised to Berna Ames; an acre of land in Polk County devised to F. S. B. (identified by Mrs. Low as Fred S. Bynon); and the residue was to be placed in trust, the interest and income therefrom to be paid over to her friends J. K. and N. W., and the survivor of either, and on the death of the survivor, the fund was to be paid to the Student Trust Fund of Oregon State College. Mrs. Low identified "N. W." as decedent's friend Nene West.

In October of 1951 decedent executed a will, prepared at her direction by Mr. Linfoot, leaving her estate to Majorie and Delbert. In 1952 decedent discussed another will with Mr. Linfoot after Delbert and his wife were divorced, and he prepared a will leaving her estate to Marjorie and Delbert's ex-wife. This will was not executed because when Mr. Linfoot presented it to her she advised him that she wasn't sure that was the way she wanted it. On 11 April 1953 decedent executed another will, devising her Polk County

property to Estella M. Bynon, and the residue of her estate to Berna Ames. At this time the 1951 will was destroyed. The 11 April 1953 will was destroyed immediately after the execution of the 24 June 1953 will, which contained a clause revoking all prior wills. Instead of showing a sudden change of testamentary intent, these wills display a development in the pattern of the testatrix' thinking, to the natural result of the will in probate.

As to the inclusion of the contestant, with whom decedent had not been on good terms, we think it ill befits him to intimate that the fact that the testatrix left him a thousand-dollar bequest amounted to a suspicious circumstance. Regarding the exclusion of the niece Marjorie, it can be seen that even in 1952 testatrix declined to execute a will naming Majorie as beneficiary as she then indicated that she was not sure that was how she wanted her will. It is true that several witnesses, decedent's friends and Polk County neighbors, testified as to declarations made by decedent as to her testamentary wishes regarding Marjorie and Delbert, and Jerry, his ex-wife. The time of these declarations is vague, but apparently it was before decedent executed the will of 11 April 1953 in favor of Estella M. Bynon and Berna Ames, thus evidencing a change from the intentions she had previously expressed to these witnesses.

As to the question of natural disposition, it is plain that decedent's brother was not a natural object of her bounty, due to a long-standing disagreement between them, though she did have a slight change of mind which occasioned the thousand-dollar bequest. Delbert, her nephew, was in disfavor due to his divorce. There is nothing to show that his ex-wife Jerry ever called on decedent after the divorce. As for Marjorie, during

decedent's earlier years they had visited, according to testimony. After decedent became ill Marjorie visited her in the sanitarium. When decedent went to the Bynon home Marjorie called Mrs. Bynon to ask about her. Decedent's declarations show that she considered Marjorie worthy of remembrance, but nothing in the record indicates an intimacy between them which would render Marjorie necessarily a natural object of her bounty.

The evidence shows that the beneficiary Berna Ames cared for decedent's mother for a number of years. She then moved to Washington, but returned at least once a year to visit decedent. When decedent retired and was taken ill, Miss Ames returned and stayed with her both in Polk County and at a house in Salem. During this time she received only her board and room plus the payment of a fifty-dollar hospital bill. Witness Ames testified that decedent had told her that she was in her will, and that she was going to leave her the 17th Street house.

Regarding the beneficiary Mrs. Bynon, the evidence shows that she and decedent were friends of long standing; that decedent and Mr. Bynon had worked in the same office and that decedent had been a frequent visitor in their home, including the holidays of Thanksgiving and Christmas. After decedent moved to Polk County she continued to visit the Bynons when she went to town, and they often went out together. Contestant attempted to show animosity between decedent and the Bynon family, but this testimony related to George Bynon, the Bynons' son, who is not a beneficiary under the will. He had been a neighbor of the decedent in Polk County and there had been a disagreement over the splitting of a power bill. This matter was later straightened out. Mrs. Bynon cared for decedent in her

home during an illness, and received no compensation. After Mr. Bynon's death in 1950 testatrix also became an intimate friend of Mrs. Low, who thereafter spent a great deal of time with Mrs. Bynon and decedent. Mrs. Low also assisted in the care of decedent and arranged for her to leave the sanitarium, which decedent thoroughly disliked. These are friends of the type that would be considered natural objects of the testatrix' bounty.

The third alleged suspicious circumstances is the activity of Mrs. Low, who suddenly appeared for the first time in various wills as a beneficiary, in talking over the will with testatrix, calling attorney and gathering witnesses. The evidence shows that it was at decedent's insistence that Mrs. Low talked the will over with her. Mrs. Low testified as follows:

"Q  Did you talk this will over with her?
"A  Yes, I did.

"Q  Before it was signed, I mean?
"A  Yes, I did.

"Q  When was that?
"A  The day that—I don't know the date, but the day I called Mr. Linfoot and told him she wanted to see him.

"Q  You called Mr. Linfoot?
"A  Yes, at her request I did.

"Q  Was that after you discussed the will with her?
"A  May I explain?

"THE COURT:  Yes.

"A  My mother called me—During all this period I had been the bridge and official goat of the whole situation. I was the only one that drove a car. I was called at 3 and 4 o'clock in the morning to help bandage this woman. I had been called upon until I was pretty well all in myself. My mother called

and said Jessie wanted to see me and I said I couldn't come any more because I was exhausted, and my mother turned to Jessie and told her and Jessie said, 'I have to see her'. So I dressed. It was sometime in the afternoon, and I went down and she told me she had made up her mind and she wanted to make a will and wanted to right now. My mother left the room and I sat and talked with Jessie about what she wanted. I said, 'I don't know anything about how you should do it, Jessie. That is entirely up to you.' And she said, 'I will do this the way I want it.' I said, 'Why don't you discuss it with Bill Linfoot?' She said, 'Will you call him for me?' And I said I would and I called him and he came up and they discussed it. I went out of the room and Mr. Linfoot told me Jessie wanted this will and she said, 'I want it right now.' And he said, 'I can't get it for you for several days because it is during my busy season.' ''

It is also evident that the decedent had independent legal advice regarding the preparation of her will. It is true that Mr. Linfoot and the Bynons had been friends for a number of years, and that the Bynons introduced him to decedent. This, however, occurred in October 1951 while decedent was still employed. She thereafter chose him as her attorney. At that time she gave him the authority to draw checks on her account, due to mortgage difficulties involving her 17th Street house and other problems. This continued until her death, with Mr. Linfoot drawing checks involving business matters until this time. Shortly after the first visit she had him draw up the will in favor of Marjorie and Delbert, and the wills that followed were all drawn by Mr. Linfoot, after discussion in the Bynon home. She discussed the will of 24 June 1953 with him two or three days prior to 24 June in the Bynon home, with no one else present, and he brought it to her on the

evening of 24 June. Regarding the execution of the will, Mr. Linfoot testified as follows:

"Q Who directed the proceedings that night?

"A I did. I handled the mechanics of the execution of the will.

"Q Can you tell the court how and why Mr. Pickett and Mrs. Farris appeared as witnesses?

"A Well, maybe I better go back a little further and explain a little more of the execution of the will.

"Q All right.

"A Would that be in order?

"Q Go ahead.

"A The will was handed to Miss Harritt. She and I at the time were alone in the front room of the Bynon home. She wore glasses and she took her glasses out of the case she carried them in and put them on and read the will. After she had read the will I then explained in my own words the import of the language in the will, and she indicated to me that was in accordance with her wishes and it was as I understood her directions to me two or three days before. So then I explained to her the need for disinterested subscribing witnesses, and she then called Mrs. Low. She at that time was sitting on the couch at a card table.

"Q Who, Mrs. Low or Miss Harritt?

"A Miss Harritt, and she called Mrs. Low and she came in.

"Q Where was Mrs. Low when she called?

"A She was in the west part of the house. I don't know if she was in the bedroom or what part of the house it was, but she was in the west part of the house and she came through a door from the west, and we then discussed who might be available for witnesses, and this was in the presence of Jessie Harritt. I do not know who made the suggestion, whether it was Mrs. Low or Miss Harritt, but anyway the two witnesses named were mentioned and

they were agreeable to Miss Harritt as subscribing witnesses; then Mrs. Low went across the street and talked to the witnesses who later came over.''

The next circumstances which contestant contends are suspicious are the testimony of a handwriting expert that the signature on the will was written hesitatingly, which is corroborrated by testimony of a subscribing witness to the will; that Mrs. Low encouraged the testatrix to sign the will; and an inference that testatrix was forced to abstain from whiskey until the will was signed, said inference being raised by the appearance of the signature on the will and the signatures on subsequent instruments in evidence.

The handwriting expert testified that in her natural handwriting on the checks, decedent wrote a steady business hand, but that the signature on the will showed that she was in a nervous state of some kind, as indicated by the tremor and shakiness of the writing. This is undoubtedly true, since decedent had been ill. Indeed, the expert testified that handwriting is governed to a certain degree by a person's health, and that a sick person who normally writes a good hand will naturally have a tendency to write a shaky hand, since illness affects the nerves and under the circumstance of illness one cannot write a clear hand. In addition, several witnesses testified to the fact that decedent was a nervous person. This is borne out by the further testimony of the expert that her handwriting on a document dated 2 April 1953 showed that decedent was in a shaky condition at that time. Dr. Greenwood testified on Miss Harritt's nervous condition as follows:

''Q  Did you notice any difference as far as her nervous condition was concerned on the 22nd and 29th of June?

''A  I don't think so, over what it was on the visits before and after.

"Q  What was her nervous condition?

"A  During all this time she had quite a tremor. She had that all through this time and, of course, it was worse at times when she was weaker during the times she was hospitalized. At this time I have no notes on it, but as I remember it, she was no different then that at any other time."

Mr. Linfoot also testified on this matter:

"Q  *  *  *  There is some testimony that Jessie was shaky and had a tremor. In the signing of this will did you notice any tremor or shakiness in her manner?

"A  Yes, she appeared to me all along to a be a person rather nervous by nature. When I first saw her, as early as 1951, she was nervous and her hand shook considerable, and during the times I had seen her during the period I had known her she was in varying degrees of nervousness. At times she was pretty good and other times she was inclined to be nervous. It wasn't a condition that existed only at the time of the execution of the will."

Regarding the alleged encouragement given by Mrs. Low to the testatrix to sign the will, the subscribing witness Mrs. Farris testified that Mrs. Low said something to decedent before she signed the will, but she could not recall exactly what was said. She didn't think, however, that there was any evidence of duress. Mrs. Low testified that if she said anything to her at the time it would have been for her not to be nervous and embarrassed in front of those people in her negligee, and it wasn't an attempt to force her to do anything against her will. The subscribing witness Pickett couldn't remember hearing Mrs. Low speak to decedent at that time, but he testified also that decedent was embarrassed about being present in her bathrobe. This is all the testimony on this point.

Contestant's petition alleges that:

"on the 24th day of June, 1953, said decedent being so pliable to the will of said defendants, being fearful lest her source of supply of alcoholic liquor be severed and being thoroughly cowed and intimidated by said defendants, Edith Bynon Low and Estella M. Bynon, was induced and influenced by said defendants to sign said document dated June 24, 1953, thereby substituting the will and testamentary wishes of defendants, Edith Bynon Low and Estella M. Bynon for her own; *  *  *."

There is nothing here upon which to base such an inference.

The sixth alleged suspicious circumstance is that Mrs. Bynon discouraged friends and favorite niece from visiting the testatrix. Decedent's friend Effie Hartman testified that she went to call on decedent at the Bynon home during the last months before she died, and each time Mrs. Bynon said decedent didn't care to see anyone. She also testified, however, that she visited decedent twice, once at the Bynon home shortly after Miss Harritt retired, and once when she was living in an apartment with Miss Ames. Mrs. Bynon testified that maybe once or twice friends of Jessie's called regarding visiting her and that she always invited them to come, and was glad to have them. She further testified that decedent never requested her to call her brother to come and visit her, but that she did call him during decedent's last illness. The niece Marjorie testified that she told Mrs. Bynon she could come to see decedent, and Mrs. Bynon said it would upset her too much. She asked Mrs. Bynon to let her know when she could come, but Mrs. Bynon didn't call. We consider that this incident is not sufficient to support suspicions of the kind for which contestant contends. It might also be noted that decedent's friend Eva Margaret Purvine

testified that she offered to take decedent during her last illness, and that Mrs. Bynon called one day, but she, Mrs. Purvine, had a house full of company at the time, and she told Mrs. Bynon that decedent could come later on and stay for awhile.

The seventh circumstance which contestant describes as suspicious is the purchase of whiskey for testatrix by beneficiaries and permitting her to drink same when testatrix was obviously a very sick woman. Contestant alleges in his petition that:

"defendants, Edith Bynon Low and Estella M. Bynon, kept said decedent well supplied with alcoholic liquor from said date of March 28, 1953, until the aforesaid date of decedent's death in their said residence for the purpose of inducing decedent to execute said will; that during such period of time from March 28, 1953, to the date of decedent's death, said decedent was enslaved by her aforesaid addiction and was rendered completely pliable to the will of said defendants, Edith Bynon Low and Estella M. Bynon, by their promises to supply decedent with alcoholic liquor, by their performance of such promises * * *."

Mrs. Low admittedly purchased some intoxicating liquor less than six times for decedent at her request. There is no evidence that Mrs. Bynon ever did so, and indeed she testified that she never owned a liquor license. It should be noted that there were no absolute instructions forbidding decedent to have any liquor. Dr. Greenwood testified that he discussed decedent's drinking with the Bynon family and told them she should be "off of it", and they said they would do their best about it. Both Dr. Greenwood and Mr. Linfoot testified that they had not seen decedent under the influence of liquor. The evidence does not support the contestant's allegations.

The final allegedly suspicious circumstance is the sanitarium rescue. The witnesses are in accord that decedent was highly dissatisfied at the sanitarium due to the fact that she could not smoke there. She was a heavy smoker and she wanted very much to be moved to another place. When Mrs. Low took decedent from the sanitarium she did so after arrangements were made by Dr. Greenwood. It might also be noted that contestant alleged that he caused decedent to be admitted to the sanitarium. The sole testimony on this point is from Mrs. Low who testified that Mrs. Bynon and the doctor made these arrangements after decedent had had an operation and Mrs. Bynon was not able to care for her. She testified that she called contestant and asked that he take decedent to a sanitarium in an ambulance, and that he took her there in his car. The so-called sanitarium "rescue" is well explained by the evidence.

We have carefully examined the evidence concerning the alleged suspicious circumstances, and find that they are insufficient, when explained, to raise an inference of undue influence. The very violence of the allegations contained in the petition of the contestant, coupled with the fact that there was a total failure to introduce evidence as to some of them, casts doubt upon petitioner's entire case. In our opinion the defendants are innocent of the charges made.

The trial judge heard the testimony and his findings are entitled to great weight. His conclusions that testatrix was competent to execute the will of 24 June and that upon executing it she was not acting under undue influence are sound.

The decree of the lower court is affirmed.