Argued December 5, 1962, reargued April 5,
reversed June 12, 1963

In the Matter of the Estate of
RILLA T. STACK, Deceased
CLINE et al v. LARSON
383 P. 2d 75

*Stewart M. Whipple,* Portland, argued the cause for appellant. On the brief were Seitz, Easley & Whipple, Portland.

*David H. Breuer,* Portland, argued the cause for respondents. With him on the brief were W. C. Beers and Walter W. Yeager, Portland.

No appearance on behalf of Intervenor-Respondent.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

ROSSMAN, J.

This is an appeal by Edna D. Larson, individually and as executrix of the estate of Rilla T. Stack, a deceased widow, from a decree of the circuit court which ruled that a document in the form of a will which Mrs. Stack executed August 3, 1955, was "a nullity and of no force or effect whatsoever." The will named Miss Larson residuary legatee and nominated her as executrix. The execution of the document was succeeded on July 22, 1957, June 12, 1958, August 8, 1958, December 5, 1958, and November 3, 1959, by the execution of five instruments in the form of codicils. Miss Larson, the appellant, is the proponent of probate of the will and the five codicils. The contestants, Thomas W. Cline, Sr., and Margaret Smith, are two cousins of the deceased. They are now the respondents. The challenged decree declared the codicils as well as the will nullities and vacated the order which had appointed Miss Larson executrix. The intervenor-contestant, Elizabeth A. Allen, who is also a

cousin of the deceased, is not a participant in this appeal.

The bases of the challenged decree are the facts that (1) Miss Larson was the secretary of Edward R. Robnett, the attorney whom Mrs. Stack employed to prepare the will, (2) Miss Larson was a friend of Mrs. Stack, (3) Miss Larson typed the will and was consulted by Mrs. Stack concerning its residuary clause, and (4) Miss Larson is the residuary legatee of the will.

Mrs. Stack died November 10, 1960, at the age of 88 years. The petition to revoke makes no claim that Mrs. Stack lacked testamentary capacity when she executed the will and the codicils; however, in detailing the facts, we will frequently mention her mental condition. The petition states its charge as follows:

> "The said Edward R. Robnett, together with his employee, the said Edna D. Larson, by use of undue influence, dominance and control over the said Rilla T. Stack caused the said Rilla T. Stack to execute as her pretended Last Will and Testament that certain document heretofore referred to as bearing the date of August 3, 1955, and through their respective dominance and undue influence over the said Rilla T. Stack so dominated and controlled all her thoughts, actions and moves that at the time of the execution of said pretended Will and the said pretended codicils thereto, the said documents did not contain the desires and wishes of the said Rilla T. Stack and was not in fact her act or will * * *."

By reverting to the dates that we have mentioned, it will be noticed that Mrs. Stack's death occurred five years and three months after she had executed the purported will and one year after she had signed the last of the five codicils. The inventory and appraisal

of the estate showed a value of $64,635.59. From the time that the deceased had reached her 16th birthday she had been a school teacher. She retired from that vocation before she reached her 50th birthday. She was thrifty and managed her estate capably. She spent but little upon herself. She had no children. When she executed the document that purports to be her will she lived alone in a home which she owned. She had many friends and in the last two years of her life lived for several months in the home of one of them.

One Ralph W. Robnett, an attorney now deceased, was the father of Edward R. Robnett whom we have mentioned. Mrs. Stack went to Ralph W. Robnett for whatever legal services she needed, and the record indicates that while the son (Edward) was still in high school his father and mother made him acquainted with Mrs. Stack. When Edward R. Robnett was admitted to the bar in 1944 he became associated with his father in the practice. In 1950 the father died, and thereupon the son succeeded to his office. From that time Mrs. Stack went to him for the legal services she needed. She did not manifest toward him the deference that some clients display toward their attorneys. She had known his father as "Mr. Robnett" and upon becoming acquainted with the son as a high school boy called him "Ed." She continued to do so when he was admitted to the bar. She frequently directed him to bring a paper to her or, in terms suitable for giving orders to a servant, acquainted him with her wants.

Miss Larson, the proponent, had become the secretary of Ralph W. Robnett in 1927 and upon the latter's death in 1950 entered Edward's employ. Some years after she began her employment for the father she became acquainted with Mrs. Stack and, as time

went on, the acquaintanceship developed into a friendship. The two women never saw each other in any place other than Mr. Robnett's office except in the last months of Mrs. Stack's life when Miss Larson visited her in a rest home where illness confined her. The two never visited one another in their homes nor did they attend together social, church or other functions. They, however, spoke to one another on the telephone frequently, and the record contains an occasional friendly letter that Mrs. Stack wrote to Miss Larson. Each was a member of the WCTU and each was a church member. Their religious denominations were not the same. Something served as a bond and united into friendship these two people. Possibly, as the accumulating years settled upon Mrs. Stack and segregated her more and more from the ordinary channels of social activity, she viewed with increased endearment individuals such as Miss Larson who continued to display an interest in her. Society has a caste system which groups people into social units according to age. Not only did old age segregate Mrs. Stack from the younger groups, but in addition her hearing and eyesight were beginning to fail. Increasing disabilities can subject their victim to the curse of austerity unless he can develop a compensating activity.

In her later years Mrs. Stack gave sums such as $500 and $1,000 to friends whom she especially liked. She also made loans upon favorable terms to persons whom she wished to help. Anticipation of a glow of appreciation by the recipients of her generous gifts and their continued interest in her may have prompted to some extent her bountiful acts. She may have distributed a part of her estate in her lifetime rather than in her will, not alone on account of the virtue that

inheres in good deeds but also because it brought the recipients closer to her as friends. She liked people and had an engaging personality. Her gifts were not to those who had an ample purse but to people who could use an extra dollar and in whom she found qualities that she liked.

Mrs. Stack entered the office of Mr. Robnett July 1, 1954, and handed him $1,000 in cash as a gift, and a like sum to Miss Larson. No one intimates that either recipient had sought the gift. At various times Mrs. Stack made similar gifts to others.

We have mentioned the fact that some years prior to her death Mrs. Stack's hearing began to fail and her eyesight began to dim. A year or more before her death some who wished to speak to her resorted to shouting. A deaf person dislikes the shouted voice and all other efforts that call attention to his impaired hearing. Miss Larson could make Mrs. Stack hear her without shouting. Naturally, a person of that kind is acceptable company for the person whose social intercourse is restricted by deafness.

Until the last two or three years of her life Mrs. Stack came to the Robnett office as frequently as once in a week or two. Sometimes her visits were purely social. At those times she would visit for a few minutes with Mr. Robnett or Miss Larson. She might then leave with Miss Larson a parcel or two while she went to stores and performed shopping. Sometimes she borrowed from Miss Larson her streetcar pass so that she could visit a friend who was confined in a hospital.

Witnesses, even those called by the contestants, described Mrs. Stack as a determined woman who was strong willed and difficult to persuade. She was of a domineering type and knew what she wanted. Thomas

Cline, a contestant, testified that Mrs. Stack "wanted her own way." His son, a clergyman, who was a principal witness for the contestants, referring to Mrs. Stack, testified:

> "She was very determined. * * * She was set in her ways, whether those ways were right or wrong. * * * I think the characteristics of determinedness would chacterize her all of her life. * * * She was definitely determined, even to the point of stubbornness. * * *"

Mrs. Ruth Campbell, who was reared by Mrs. Stack's mother as a foster daughter and who, therefore, had known Mrs. Stack over an extended period of time, testified:

> "Q Was she independent in her ways?
> "A Oh, yes; very definitely so.
> 　　　*　　　　　*　　　　　*
>
> "Q Was she the type of person that you could tell what to put in her will?
> "A No, definitely; I wouldn't believe that.
> "The Court: I didn't hear you; I am sorry.
> "A No. I feel positive that she wouldn't."

Antoinette Wagner, an employee of a real estate office with which Mrs. Stack had had many business relationships, when asked whether Mrs. Stack had "a mind of her own," replied:

> "I don't think anybody could stop her when she wanted to do something or didn't want to do something.
> "Q Was she more or less independent, was she.
> "A Very."

Mrs. Stack had a dislike for advice which she had not sought. One of the witnesses whose testimony was similar to that of others spoke as follows:

> "* * * or if somebody would do something

she didn't think was right, if they were a friend of hers, she wouldn't have anything to do with them.

"Q  Did she have strong ideas about drinking?

"A  Yes.

"Q  Would you say she was an intelligent person?

"A  Very intelligent; very interesting to talk to.

"Q  Would you say she could be dominated by others?

"A  No.

"Q  What makes you say that?

"A  Well, I just know she couldn't. Well, I don't believe that anybody could dominate her.

"Q  Was she independent minded?

"A  Very much.

"Q  Was she good hearted from your observation?

"A  Very much."

We shall mention upon the subject of the deceased's tenacity of purpose the testimony of one more witness, Bessie E. Gardner, a neighbor of Mrs. Stack. She was called to the witness stand by the contestants. In taking note of her testimony that Mrs. Stack was a very determined individual, we shall mention testimony given by Mrs. Gardner that describes other characteristics of the deceased. In September of 1959, which was about four years after the will had been executed and about thirteen months prior to Mrs. Stack's death, Mrs. Stack's hearing and eyesight were poor, according to Mrs. Gardner. Nevertheless, Mrs. Stack still wrote letters and, according to Mrs. Gardner, a friend could make her hear "if you talked to her." In that period Mrs. Gardner helped Mrs. Stack

occasionally with correspondence and at other times drove her to places she wished to visit. According to Mrs. Gardner, Mrs. Stack's "health, considering her age, was very good until she had the bad fall." The latter occurred in March of 1958 when Mrs. Stack fell down a flight of basement stairs that a witness for the contestants described as "very treacherous." In September of 1959 Mrs. Gardner drove Mrs. Stack to Mr. Robnett's office and there Mrs. Stack obtained from Miss Larson her will and the existing four codicils. Mrs. Gardner testified that at that time, "I think she was completely of sound mind. She was like any other older person." Mrs. Stack handed the will and codicils to Mrs. Gardner and requested her to take them home, read them and study them. She explained that she might like to consult Mrs. Gardner about the will. November 3, 1959, Mrs. Gardner, at the deceased's request, again drove her to Mr. Robnett's office. She then returned the will and four codicils; at the same time she gave directions for the preparation of the fifth codicil and the latter was executed that same day. This was the last of the five codicils. Its execution occurred one year before Mrs. Stack's death.

■ The respondents (contestants) argue:

"A will not conformable to the nature and disposition of the testator is an element to be considered in determining the question of undue influence."

The legal principles governing contentions of that kind were stated with clarity by Mr. Justice O'CONNELL in *In re Reddaway's Estate,* 214 Or 410, 329 P2d 886:

"A person may make a legally effective disposition of his estate which reasonable men would regard as unfair. He may favor his mistress over his wife, or he may disinherit a deserving son, and the

law will not concern itself with his moral duty. In re Estate of Riggs, 120 Or 38, 241 P 70, 250 P 753 (1926). But if he does make an unfair or unnatural disposition it is a circumstance to be weighed in determining whether improper influence had been used. In re Estate of Manillus Day, supra, points out that where a confidential or fiduciary relation exists and the will is unjust or unnatural, slight evidence of the exercise of undue influence may be sufficient to invalidate it. The 'disregard of natural objects of testator's bounty' is listed as one of the indicia of undue influence in Estate of Elise Rosenberg, supra, 196 Or 219 at 230. See also In re Estate of Meier, supra, 190 Or 140 at 150; and 1 Jaureguy & Love, Oregon Probate Law and Procedure, supra, at § 323, where other Oregon cases are collected."

■ In short, the law of wills, unlike the law of torts, does not create for testators a standard such as a reasonably prudent person, and demand that all testators and their wills conform to it. Each is left free to do with his property as he wishes provided his disposition of it does not run afoul of other legal principles. However, an unnatural will, as Justice O'CONNELL's words indicate, "is a circumstance to be weighed in determining whether improper influence had been used."

We take the following from *In re Easton's Estate,* 140 Cal App 367, 35 P2d 614:

"It is well settled that collateral heirs, such as brothers and sisters, are not 'natural objects of bounty' as that term is used in the interpretation of wills, and therefore, in cases such as this, where the next of kin are collaterals and one or more are unprovided for in the will, the pretermitted persons, in order to establish that the instrument is unnatural, must show affirmatively that they had peculiar or superior claims to the decedent's

bounty; and, if no such claim is adduced, the instrument cannot be held to be unnatural."

The deceased had no relatives that were closer to her in kinship than cousins, but of the latter she had ten or twelve. The relationship between Mrs. Stack and her cousins was not manifested by warmth, visits back and forth, or exchange of letters. Two of the cousins, as we have mentioned, are the contestants. Another who became an intervenor did not participate in the trial and is taking no part in this appeal. Only one of the ten or twelve cousins testified. One of Mrs. Stack's cousins whose name is Ray Cline is severely handicapped by a cripping illness and his wife moves about in an invalid chair. Mrs. Stack manifested a deep sympathy for the two and gave them substantial gifts of money.

In 1957 Mrs. Stack wrote to her cousin, Thomas W. Cline, Sr., who is one of the contestants, stating that she did not believe that she ought to continue to live by herself. The letter suggested a joint occupancy of a home. Mrs. Stack owned the home in which she lived and seemingly the Clines lived in a trailer. Nothing developed from this letter until shortly after Mrs. Stack sustained her fall in March of 1958 and suffered some disability. Upon that juncture Mr. and Mrs. Thomas Cline moved into Mrs. Stack's home and cared for her. They remained for about two months. Shortly after they came Mrs. Stack gave them $1,000. She took care of all household expenses.

Friction rather than cordial feelings resulted from the presence of Mr. and Mrs. Thomas Cline in Mrs. Stack's home. Mrs. Stack thought that her cousin or the latter's wife took some of her household items. She expressed herself to more than one individual

and in so doing spoke critically of the Clines. She even used the words "theft" and "steal." Thomas Cline has a son, Donald, who is a clergyman. After his mother and father had received the gift of $1,000, he obtained from Mrs. Stack a loan of $5,000 at 4 per cent interest with nothing payable upon the loan—principal or interest—for ten years. The note was unsecured and was written by the son who was past 30 years of age. Under its terms Mrs. Stack would have had to reach her 96th birthday before she would receive anything whatever upon the loan. Mrs. Stack called the note to the attention of Mr. Robnett and thereafter a new note was prepared. This situation strained still further the relationship between Mr. and Mrs. Cline and Donald upon the one hand and Mrs. Stack upon the other.

A witness who was wholly disinterested testified that Mrs. Stack "was very upset" with Donald. Mrs. Thomas Cline testified that some time after she and her husband had moved out of Mrs. Stack's home and were making a call upon her, the latter "told us she didn't want to ever see us again and that we had stole from her." Mrs. Rose Nuszbaum, a neighbor of Mrs. Stack, stated that the latter complained about the Clines and said "she don't like them at all." Still another neighbor testified that after the Clines had moved in with Mrs. Stack the latter declared, "she could not stand them any more." One witness gave testimony favorable to Donald, but that witness had not been an intimate friend of Mrs. Stack.

The second codicil of the will which was executed by Mrs. Stack June 12, 1958, canceled a bequest of $500 for Thomas Cline and a similar amount for his wife with the explanation "that I have already given them the sum of $1,000." Those legacies had been provided

by the will of August 3, 1955, which is under attack. After the Clines had left the home of Mrs. Stack, the latter lived for a short time with a friend by the name of Mrs. Smith and then resumed living in her own home by herself until January of 1959. In this period she went upon occasions to Mr. Robnett's office. On one of the visits she gave instructions for the preparation of the third codicil. Later, by telephone, she directed the preparation of the fourth codicil and a day or two later executed it in her home. In January of 1959 she moved into the home of a friend and remained there until June. August 26, 1959, she entered a rest home conducted by a Mrs. Ruth Martin who was a member of the religious denomination to which Mrs. Stack subscribed. She remained there until April 26, 1960, when she entered Portland Sanitarium for a short period due to a threat of pneumonia. May 18, 1960, she entered a convalescent home known as Porthaven Convalescent Home and remained there until her death November 10, 1960. Mrs. Martin, in whose rest home Mrs. Stack lived from August 26, 1959, to April 26, 1960, testified concerning Mrs. Stack, "Well, I always thought she was quite spry for an old woman, and very careful of her business. I mean she was always anxious about her business affairs."

The fifth codicil was executed November 3, 1959, which was in the period while Mrs. Stack lived in the Martin Rest Home (August 26, 1959, to April 26, 1960). Mrs. Gardner testified that November 3, 1959, she took Mrs. Stack to Mr. Robnett's office. She had taken Mrs. Stack there and to other places on many occasions. While Mrs. Stack was in Mr. Robnett's office on November 3, 1959, she gave directions for the preparation of the fifth codicil. Upon that occasion she also returned the will and four codicils which

she had obtained in the preceding September. In reply to a question of the trial judge, Mrs. Gardner testified that on November 3, 1959, Mrs. Stack's mind was sound. Her words were:

"* * * I would say she was, she was as good as she had been, you know for a long time.

"Q Do you think she knew what she was doing at that time?

"A I think she did very well.

"Q Would you say that her mind was so weak and enfeebled at that time that she was likely to be imposed upon by artful and designing persons?

"A I wouldn't think that she was a person who could ever be imposed upon, frankly.

"Q Did you feel that she was a determined person?

"A Very determined.

"Q And knew her own mind?

"A Very definitely.

\* \* \*

"Q Was she fond of Miss Larson?

"A Yes, I think she thought a great deal of her.

\* \* \*

"Q She was well educated?

"A She was very well educated; she was a very progressive woman for the time of her life.

"Q Was she religious?

"A Very religious.

"Q I take it nobody could force her into doing anything she didn't want to do?

"A I think they proved that when they took her to the hospital. They just had to use force with her, and it was very bad.

"Q When she didn't want to do anything, you couldn't force her to do it?

"A Not easily, no. I don't think it would be easy.

"Q She was quite a stubborn individual?

"A Well, I think she had very set ideas—maybe I should put it that way.

"Q In many respects she was quite kind, was she?

"A She was very kind to people; she did many wonderful things."

The first four codicils were executed by Mrs. Stack in her home and the fifth, as we have mentioned, was executed by her in Mr. Robnett's office. Mr. Robnett was absent at that time. An attorney by the name of Chris R. Marthaller who rented space from Mr. Robnett after he had moved to his present location and who had occasionally handled some of his business supervised the execution of the fifth codicil. He swore that before he permitted Mrs. Stack to sign the codicil he took her into his office and not only satisfied himself as to her competency, but also as to her familiarity with the document. According to him, her mind was clear and she understood the significance of the document and the nature of the act which she was about to perform. When she undertook to sign the codicil, "she was able to find the line herself," so Mr. Marthaller swore. Miss Larson was not present during the execution.

The will that Mrs. Stack executed August 3, 1955, and which is under attack in this proceeding contained the provisions, apart from formal matters, that we will now mention. Its second paragraph bequeathed $500 each to Thomas Cline and his wife. We have mentioned that the second codicil eliminated both of those bequests; it stated, "I have already given them the sum of $1,000." The third paragraph bequeathed "unto my cousin Jesse Cline" $500. The second codicil eliminated that bequest. It mentioned no reason. The

fourth paragraph bequeathed "unto my cousin Ray Cline" a legacy of $500 and a similar one to his wife. Ray Cline and his wife are the crippled persons that we have mentioned. Those bequests were not canceled.

The fifth paragraph of the will bequeathed "unto my friend, Josephine Erickson" $500. The third codicil canceled that bequest "for the reason that I have already given her said sum." The sixth paragraph bequeathed "unto my friend Madaline Foster" $500. That bequest was not altered. The seventh paragraph bequeathed "unto my friend Dora Blocksom" $500. The second codicil eliminated that bequest "for the reason that she has predeceased me." The eighth paragraph bequeathed "unto my friend, Minnie McClure" $500. That bequest remained unaltered. The ninth paragraph bequeathed "unto my friend, Rose Nuszbaum" $500. The fifth codicil eliminated the bequest with the explanation, "I have heretofore given her said sum." The tenth paragraph of the will bequeathed to "my friend, Ruth Campbell, the sum of $1,000" payable at the rate of $30 per month with the provision that in the event that Ruth Campbell died before the entire sum was paid, the remainder should be paid to the aforementioned Josephine Erickson. Ruth Campbell was reared by Mrs. Stack's mother. She described Mrs. Stack as "a rather domineering person" who did a lot of wonderful things for many people and who was "very keen" in handling her business. According to her, Mrs. Stack stated that Mr. Robnett had been "very good to her."

The eleventh paragraph named the proponent, Edna D. Larson, residuary legatee and nominated her as executrix. The will revoked all other wills. The one that had preceded it likewise had named Miss Larson executrix but contained no bequest for her. It,

however, had a bequest of $1,000 for Mr. Robnett. That bequest was canceled by the will of August 3, 1955.

The codicils contained some provisions in addition to those that we have named. We deem it unnecessary to take note of them, with the exception that the fifth codicil bequeathed to Mrs. Gardner, the individual who frequently drove Mrs. Stack to places to which she wished to go, the sum of $1,000. The same codicil bequeathed to Dr. D. W. Huntington, a retired dentist, the sum of $500 and to his wife a like sum. The Huntingtons frequently drove Mrs. Stack to places that she wished to reach. The same codicil bequeathed to the Oregon Baptist Convention which maintained a cemetery the sum of $1,000 "for perpetual care." The cemetery was the burial ground of some of Mrs. Stack's family and upon her death her remains were interred there.

August 3, 1955, Mrs. Stack who was then 83 years of age entered Mr. Robnett's office and requested the preparation of a new will, that is, the will we just reviewed. On that day Mr. Robnett drew from his files a copy of the will she had executed in April of 1954. The residuary clause of that will bequeathed the residue as follows:

"Two thirds thereof unto the Central Seventh-day Adventist Church, N.E. 30th Avenue at Sandy Boulevard, Portland, Oregon; and one-third thereof unto the Apostolic Faith, 8 NW 6th Avenue, Portland, Oregon."

The copy which Mr. Robnett used in the drafting of the new will contains many provisions that are stricken or opposite to which there is written by pencil the word "out." According to Mr. Robnett, the writing

and striking were done by him and Mrs. Stack August 3, 1955. The two finally came to the fifteenth paragraph of the 1954 will which was the residuary clause. At that point Mrs. Stack stated that she was uncertain as to whom she wished to make residuary legatee. She explained that she had already given the churches the full sums that she intended they should have. She mentioned her interest in children, children's homes and hospitals. Mr. Robnett suggested that she should go home, think the matter through, and return when she had decided upon the residuary beneficiary. She replied that she wished to execute the new will on that day. At that juncture Mr. Robnett was compelled to leave upon an engagement which was overdue, and placed Mrs. Stack in charge of Miss Larson. The latter and Mrs. Stack spent about an hour in discussing possible residuary beneficiaries and in so doing reviewed several welfare agencies, principally children's homes and hospitals.

Finally, Miss Larson recommended that Mrs. Stack return to her home and reach a conclusion as to whom she wished to be the residuary beneficiary. Mrs. Stack replied:

"No. I won't do that. I could get run over and killed crossing the street. * * * Then those churches would get all that money and I have given them all I want them to have."

After more discussion Mrs. Stack declared: "Well, put your name in there then." Miss Larson exclaimed, "Me? You know you don't want to leave your money to me." Mrs. Stack stated, "And why not? You can do good with it just as well as I can." Shortly Mrs. Stack stated, "You go ahead and write the will the way I said, and I'll sit right here until you do." Miss

Larson then said that she would obey Mrs. Stack's order, but that she would deem herself residuary legatee only until Mrs. Stack had decided upon a permanent one. Shortly, Mr. Robnett returned to his office and was then given the will that Miss Larson had typed. He took Mrs. Stack into his office, closed his door, and inquired of her why she wanted Miss Larson as residuary beneficiary. He swore that Mrs. Stack replied that Miss Larson could do good with the money just like she had done herself. By that time Miss Larson had left the office. Mr. Robnett summoned from another office in the building a friend and thereupon the latter and Mr. Robnett became the attesting witnesses to the will.

The friend, John D. Boone, testified:

"Q  Did she appear to be under any restraint?
"A  None.

"Q  Did she appear to you to be under any undue influence?
"A  No, sir.

"Q  Did she appear to you to be under any fraudulent misrepresentation?
"A  No."

Mr. Robnett was the other attesting witness.

The first codicil stated, "Other than the foregoing, my will shall remain as heretofore declared." The other four, in addition to the language just quoted, mentioned the existing codicils.

We have mentioned Miss Larson's testimony in which she stated that when she entered her name in the will as residuary legatee she told Mrs. Stack that she would deem herself temporary residuary legatee, and that when Mrs. Stack had decided upon a perma-

nent choice a new will could be drafted. She further testified:

"As time went on I expected her to be in in a short time to change her will, but time went on. She would come in the office and talk about all kinds of things but she never once mentioned her will. So, finally I began to get worried about it because I thought maybe she had forgotten, * * * it must have been at least six or seven months afterward, I said to her one day: 'Did you forget that you made a will and left me practically all your money?' and she said, 'No, I didn't forget; I just thought you could do good with it. Can't you?'

"Q Was anything else said at that time?

"A Yes, I said, 'Well, yes, of course I can, but why me?' so she talked about something—either somebody had told her or she had heard, I forgot which, that I did quite a bit of good with my money, so she said, 'I just thought that you could do good with this too.'"

Mrs. Stack then changed the subject. On two later occasions Miss Larson inquired of Mrs. Stack, so Miss Larson swore, whether she was ready to write a new will with a permanent residuary legatee. Miss Larson stated that Mrs. Stack seemed annoyed with the repeated inquiries and answered, "When I am, I'll tell you."

If Mrs. Stack was the victim of undue influence, coercion, dominance, or other wrongful means that were exercised upon her when she directed Miss Larson to insert her name in the will, it is evident that she had many opportunities to speak about it and to relieve herself from its effect. More than five years and three months passed from the day when she signed the will until her death. She did not lead a hermit-like

life, but had many friends; and if she had been made the victim of a wrong, she could have summoned their help. Her will and her estate commanded much of her attention in the later years of her life, as is evident from the fact that she wrote five codicils, made several sizeable gifts and after so doing made appropriate changes in her will.

In the period of more than five years that passed after she had executed the will and before death claimed her, Mrs. Stack obtained her will and placed it in the custody of a close friend for a period of about six weeks with the statement that she would consult the friend about the will. That very fact afforded still another good opportunity for Mrs. Stack to voice complaints about undue influence if any had been perpetrated at her expense. In that period of a month and a half the will claimed her attention, for when she returned it to Mr. Robnett's safe she directed the preparation of one of the codicils.

Showing still further that Mrs. Stack had good opportunity to relieve herself of the results of wrongful influence if any had been exercised, is the fact that in March 1958, two and one-half years after she signed the will, the contestant, Thomas Cline, and his wife moved into her home and lived with her for two months. Thomas Cline is the only one of the cousins that testified. Neither he nor his wife testified that Mrs. Stack told them that she had been the victim of fraud, pressure, undue influence or any other wrong. Mr. Thomas Cline was the father of Donald whom we have mentioned. Donald called upon Mrs. Stack many times in the period beginning with March of 1958 and extending to the period of her death. He called upon Mrs. Stack not only in her home but also in the rest homes. According to him, he discussed

with her her business, health, attorney, and the latter's charges. He made suggestions to her about her will, its provisions, and those who should be beneficiaries. In the meantime he consulted with an attorney who was a friend of his. He even questioned Mrs. Stack whether she was satisfied with her attorney or was contemplating a change. He asked Mr. Robnett for permission to read Mrs. Stack's will and inquired whether a guardianship should be sought for her. Here, then, were excellent opportunities for Mrs. Stack to complain about undue influence if she had been the victim of any. Donald did not claim that Mrs. Stack made any complaint of that kind.

Affording Mrs. Stack still further opportunities to make complaints was the fact that after executing the will she lived upon two occasions with friends; at least one of them was very competent. It is not claimed that in those periods she said anything about undue influence or efforts to influence the disposition of her estate. Toward the close of her life she lived for several months in a rest home conducted by a woman (Mrs. Martin) who subscribed to the same religious faith as Mrs. Stack. That individual displayed a friendly interest in Mrs. Stack and since in that period Mrs. Stack went upon at least one occasion to Mr. Robnett's office (when the fifth codicil was prepared), it seems reasonable to infer that Mrs. Stack must have been thinking about her will in that period. It likewise seems reasonable to infer that she would have told her friend who operated the rest home about dominance, undue influence, or other wrongs if, in fact, she had been the victim of anything of that nature.

Nothing specific has been called to our attention which indicates that the challenged will was the prod-

uct of undue influence, dominance, or other oppressive action. No witness identified even vaguely anything wrong which had been perpetrated at the expense of Mrs. Stack and that caused her to insert in the will the name of Miss Larson.

Nor does any evidence indicate that the will was an unnatural one for Mrs. Stack to write, or that it was foreign to the manner in which her daily life foreshadowed that she would eventually dispose of her bounty. The will and its codicils contained legacies for individuals whom Mrs. Stack had for many years deemed friends and whose attachment to her was time tested. She had come to see that she could rely upon them for kind-hearted interest. For example, Mrs. Gardner and Dr. Huntington had driven her in their automobiles upon many occasions to places where she wished to go. In addition, Mrs. Gardner, as a result of Mrs. Stack's action, had had possession of her will and codicils for about six weeks and then, upon the request of Mrs. Stack, had returned them. Dr. Huntington for a longer period possessed $10,000 of Mrs. Stack's money. His entrustment with it was not evidenced by even a receipt; yet he returned it honorably upon request. The circumstances indicate that Mrs. Stack gave her money not merely to friends for friendship's sake but to those who reflected qualities that she esteemed and who needed some help. The contestants appear to believe that mere kinship should suffice to bring the estate to them. But it is evident that kinship was not a strong factor in Mrs. Stack's contemplation.

Miss Larson possibly does not need financial help, but the record indicates that Mrs. Stack had observed that she used her money for worthwhile projects and

had likewise observed in her attributes of character that she prized.

We have seen from the evidence that Mrs. Stack had eliminated from her will all bequests to her cousins except the one for Ray Cline and his wife. That bequest was due to Ray's needs. We have also seen that Mrs. Stack, for reasons that were based upon substantial grounds, had become displeased with those of the Clines who came to her attention in the period material to our inquiries. To have given them the estate under those unfortunate circumstances would have been unnatural for her. A natural will "may raise an inference favorable to the validity of the will." *In re Southman's Estate,* 178 Or 462, 481, 168 P2d 572.

We believe that the contestants did not present any direct evidence showing that the will was written or signed by the testatrix as a result of undue influence or some other wrong exerted by the proponent at the expense of the testatrix. However, the contestants claim that the manner in which the will was drafted condemns it. They point to the fact that Miss Larson typed the will, that she was Mr. Robnett's secretary, that Mrs. Stack consulted her about the residuary clause and that a confidential relationship existed between her and Mrs. Stack. Miss Larson, the proponent, concedes that she was consulted about the residuary clause and that she had many times performed for the testatrix the little services of which an office secretary in a law office is capable. It will be recalled that when Mrs. Stack entered the office she was undecided upon the residuary legatee and that she consulted both Mr. Robnett and Miss Larson upon that subject. Giving advice upon that subject did not require of Miss Larson any knowledge of law. Any person who was well informed could have made

helpful suggestions. Further, Miss Larson possessed none of Mrs. Stack's wealth and was not indebted to her.

■ Obviously, Miss Larson had influence with Mrs. Stack, if we restrict the meaning of the word "influence" to the effect which amiable qualities exert upon the person who is the object of their attention. No one is likely to bequeath to another a sum of money unless the legatee has won the good will of the would-be testator. Accordingly, it is likely that many bequests are the result of influence. The only influence which the law of wills bans is that which seeks to ensnare a bequest by wrongful means.

■ The burden of showing the exercise of undue influence at the time of the execution of a will is upon the contestant. *In re Roblin's Estate,* 210 Or 371, 311 P2d 459; *In re Reddaway's Estate,* 214 Or 410, 329 P2d 886. However, where a beneficiary of the will who sustained to the testatrix a confidential relationship participated in the drafting of the will, as in this case, a presumption of improper influence comes to the aid of the contestant. The presumption arises from the confidential relationship and the participation in the drafting. It requires the beneficiary to come forward with a satisfactory explanation for his actions. He must show that he did not abuse the confidential relationship and did not employ improper influence. The contestant need not offer at the outset any evidence that undue influence was exerted. The presumption suffices to call upon the proponent for an explanation. If a persuasive reasonable explanation is laid before the court, the contestant must meet it if he expects to prevail. *McCaslin v. Mummery,* 222 Or 599, 352 P2d 1111; *Toomey v. Moore,* 213 Or 422, 325 P2d 805; *In re Estate of Meier,* 190 Or 140,

224 P2d 572; *In re Southman's Estate,* 178 Or 462, 168 P2d 572; *In re Lobb's Will,* 177 Or 162, 160 P2d 295; *In re Lobb's Will,* 173 Or 414, 145 P2d 808; *In re Rupert's Estate,* 152 Or 649, 54 P2d 274; *In re Knutson's Will,* 149 Or 467, 41 P2d 793. In short, if a will which results from a situation such as the one now before us is to be set aside, the record—whether consisting of presumptions or evidence—must show that undue influence was actually exercised, and a court cannot "accept in lieu of substantial evidence mere suspicion, inuendo, insinuation, and speculation." 1 Jaureguy & Love, Oregon Probate Law and Practice 319, citing *Trombly v. McKenney,* 191 Or 90, 228 P2d 417.

The rules just noted have been stated and employed by this court many times. They are not unique with this jurisdiction but reflect the law virtually everywhere. Obviously, no two cases are exactly alike; and when facts vary, the presumption which issues from them and which accuses the attorney of having exercised undue influence is dependent upon their persuasiveness. *In re Brown's Estate,* 165 Or 575, 108 P2d 775. In *McCaslin v. Mummery,* 222 Or 599, 352 P2d 1111, Mr. Justice WARNER, author of the opinion, took occasion to quote from *In re Estate of Urich,* 194 Or 429, 242 P2d 204, as follows:

"Each case must be decided upon its own peculiar facts. There is no fixed rule that is decisive in all situations."

The case at bar presents a situation which warrants prima facie a deduction of improper influence. The evidence shows that Miss Larson stood in a confidential relation to Mrs. Stack and that she participated in the preparation of the will.

■ A bequest to an attorney who drafts a will, or to his secretary, is not void per se. The rule goes no further than to create a presumption of invalidity. The presumption is not conclusive; it is disputable. The presumption permits an explanation and if the explanation passes all tests as to reason and truthfulness, it will be accepted by the court. The explanation must, of course, show that the attorney exercised no undue influence and that the will is in truth the will of the deceased and not the product of the beneficiary's machinations.

■ We mentioned that each case must be decided upon its own peculiar facts and that the strength of the presumption which suggests undue influence is dependent upon the cogency of the evidence. That statement is well illustrated by a comparison of *McCaslin v. Mummery,* supra, and the two cases entitled *In re Lobb's Will,* supra.

■ In *Lobb's Will,* supra, the testatrix executed her will when she was of approximately the same age as that at which Mrs. Stack executed hers. The contestants in this case, by taking note of the ages of the two individuals, of the fact that Mrs. Lobb's attorney became the beneficiary of her will as Miss Larson became the beneficiary of Mrs. Stack's will, and of a few more corresponding facts, seek to show that the two cases dealt with virtually identical facts. However, Mrs. Lobb and Mrs. Stack were individuals, and individuals are not fungibles. The two were very different. Unless the witnesses in the Lobb case misstated the facts, Mrs. Lobb's attorney to whom she bequeathed her entire estate lavished attention upon her. She was peculiarily susceptible to attention of that kind and seemed to have a weakness for it when it came from men. Her attorney gave her flowers

and bottles of wine. He offered to her an expensive mink coat. He wrote letters to her and made frequent calls upon her. When she received word that he would shortly visit her she displayed the interest and excitement that would have become a high school girl. After the visit was over she told others about it. She even mentioned to friends that her attorney had sought and received the privilege of bestowing a kiss upon her. In fact, she told friends that if she were twenty years or so younger she would become the attorney's bride. She needed help in the handling of her estate, and received it from the attorney. He made no charge. She was on cordial terms with her relatives and received gifts of substantial value from them. But she was a changeable woman. The attorney's display of affection won the heart and purse of this elderly woman. Mrs. Stack was a very different type of person. We shall not recount the facts once more, but if one reverts to preceding paragraphs of this opinion, he will readily see the truth of the statement just made. Mrs. Stack handled her affairs in a highly capable manner and no longer deemed herself as a marriagable young woman. It is clear that Mrs. Stack did her own thinking and resented efforts to influence her. When Mrs. Stack's attorney called upon her it was at her request, and he did what she directed. She was in command.

We said that no two cases are alike. Yet, *McCaslin v. Mummery,* supra, has some fundamental facts that are similar to those now before us. In it McCaslin, an elderly bachelor, called upon Mr. Biggs, attorney for Willamette View Manor, a large retirement home, and asked him to prepare a will for him. McCaslin told Mr. Biggs that he wished to give his entire estate, approximately $90,000 in value, to the Manor.

The conference was held in the Manor itself. The attorney prepared the will and Mr. McCaslin signed it. The will not only named the Manor as beneficiary but also named its administrator as executor. The attorney and his secretary were the attesting witnesses. The deceased received no advice from any other attorney. The attorney who prepared the will was not only the attorney for the Manor but was also its secretary. In sustaining the will against contentions similar to those urged in the instant case, this court said:

> "We are not unmindful of the rule which treats the preparation of a will by one who is the attorney for the sole beneficiary as a circumstance giving rise to a suspicion of undue influence on the part of the beneficiary.

> "But at no time have we decried the employment of such attorney as an incident which *ipso facto* operates to defeat the will so drawn. Standing alone, it is at best only a 'suspicious circumstance' strongly suggesting the need of further inquiry. As many of our opinions disclose, ofttimes the information thus obtained completely dispels any shadow of suspicion so cast and confirms such attorney and client relationship as a valid and meritorious one, justifying no judicial reproval of the activity, if any, on the part of the beneficiary or beneficiary's legal counsel."

This court found that the explanation of the preparation and execution of the will was reasonable and truthful.

We have seen that Miss Larson produced a coherent reasonable explanation of her role which is entirely consistent with other evidence tending to show that no improper influence was exercised by her or Mr. Robnett in the preparation and execution

of the will. We believe that Miss Larson's explanation reflects the truth. She met the demand that the presumption had placed upon her.

We believe that Mrs. Stack's will, executed by her August 3, 1955, did not run afoul of any rule of law so far considered.

■ There is still another reason which requires a conclusion that no wrongful means was employed in the drafting and execution of the challenged will. It centers in the five codicils. From the day that the first of them was executed until Mrs. Stack's death more than five years passed.

Miss Larson typed each of the five codicils, but she was not named as beneficiary in any of them. Some of the codicils canceled paragraphs of the will that made bequests, but in so doing, with a single exception, they explained that the gifts had already been made. Obviously, cancellations of that kind did not increase the residue that would be available for Miss Larson. The fifth codicil made additional bequests that totalled $3,000. When we take into consideration bequests canceled by other codicils, the latter reduced the residue to the extent of $1,000. Accordingly, the codicils which Miss Larson typed diminished the amount of the residue.

Miss Larson was not present at the execution of the first four codicils. They were executed in the home of Mrs. Stack. Those present were Mr. Robnett and a friend of his who acted as attesting witnesses. The fifth, as we have noted, was executed in Mr. Robnett's office, but neither Mr. Robnett nor Miss Larson were present. In two instances the codicils were typed after Mrs. Stack had telephoned to Mr. Robnett's office and stated what she wished done. In the other three instances Mrs. Stack called at Rob-

nett's office, but when he was not present told Miss Larson what she wanted prepared. After it was typed Robnett brought it to Mrs. Stack's home.

The first codicil concluded with these words: "Other than the foregoing, my will shall remain as heretofore declared." The second employed this passage: "Other than the foregoing, my said will, including the Codicil of July 22, 1957, shall remain as heretofore declared." The third, fourth and fifth codicils added to the language just quoted reference not only to the will but to all extant codicils.

We quote the following from 95 CJS, Wills, § 303, page 95:

"A codicil executed with the formalities required by statute for the execution of wills operates as a republication of the will, as far as it is not altered or revoked by the codicil, if the codicil is valid and if the intention of the testator is not thereby defeated; and the will and codicil are to be regarded as but one instrument speaking from the date of the codicil."

The five codicils were executed in the manner required of wills. Each codicil was read to Mrs. Stack or she herself read it. In some instances, possibly in all, she not only read the instrument but also listened to a reading of it. It is clear that she was familiar with the meaning and future effect of each.

The section of the text from which we just quoted continues as follows:

"Although it has been held that a codicil does not republish an unattested will, the general rule is that a codicil duly executed will operate as a republication of an earlier will or codicil, although the latter is inoperative or imperfectly executed or attested, as where a codicil duly executed by a

testator of sufficient capacity has been held to republish and validate a prior will or codicil which was invalid because of alterations after execution, absence of testamentary capacity, presence of undue influence, violation of the then existing statute against perpetuities, or failure to comply with statutory formalities with respect to execution."

We take the following from the annotation in 21 ALR2d 831:

"All the authorities agree that a will which was invalid as originally executed because of fraud or undue influence is republished and validated by the execution of a codicil thereto by the testator at a time when he was not subject to fraud or undue influence."

The applicable rule is stated as follows in 57 Am Jur, Wills, § 626, page 428:

"A duly executed codicil operates as a republication of the original will and makes it speak from the new date, in so far as it is not altered or revoked by the codicil, although the codicil is not physically annexed to the will, and although the will is not in the presence of the testator at the time of executing the codicil, where it refers to the will in such a way as to identify that instrument beyond doubt. If a codicil revokes in terms portions of the will, it republishes the will as of the date of the codicil in respect of all parts not revoked."

Oregon employs the rule which is expressed in the quoted language, as we see from a succinct summary of this court's holdings that is given in Jaureguy and Love's Oregon Probate Law and Practice, § 380.

"* * * Thus, the term has been applied to the case of a valid codicil to a will which had been void for mental incapacity at the time of its execution, the effect of the reference in the codicil to the void will being to validate it.

"True revival, however, takes place when after a will has been revoked the testator executes a codicil stating that it is a codicil to that will. The result is that the revoked will is revived; and if the revocation of the will thus revived had been by means of a later will, that later will is thereby revoked to the extent it is inconsistent with the former one. 'The apparent theory is that as the republication of a will once revoked makes it speak as of the time of the republication, a codicil republishing an earlier will, operates as a revocation of a later one, making inconsistent disposition of the property.'"

The Oregon decisions cited by Jaureguy and Love fully support their statements.

We are satisfied that Mrs. Stack's execution of the codicils republished her will, if any republication of it was required to give it validity. None was needed; and accordingly, our treatment of the codicils is merely an additional reason.

We are satisfied that no undue influence or other wrong was exerted upon Mrs. Stack; that her will was a natural, reasonable one; that she fully understood all of its provisions; that its execution was her free and voluntary act; and that Miss Larson did not abuse the confidence that Mrs. Stack had in her.

We believe that Mrs. Stack's will that was executed by her August 3, 1955, and its five codicils are valid.

The challenged decree is reversed and set aside. The will of August 3, 1955, and its five codicils are entitled to probate.

SLOAN, J., specially concurring.

I concur in the last part of the opinion which holds that the execution of the codicils acted to republish the will.

DENECKE, J., dissenting.

This is an extremely close case on the facts and, therefore, the kind of case in which a dissent could indicate merely an excess of argumentativeness. Nevertheless, I do dissent in the belief that the majority opinion tends to weaken two important principles. First, apparently, the finding of the trial judge that undue influence was exerted is given little weight. Second, the principle that bequests to the draftsman of the will are "reprehended by law" was in effect stated, but held to be of insignificant force. *In re Lobb's Will,* 177 Or 188, 160 P2d 295 (1945).

This is an equitable proceedings in which this court tries the facts de novo. However, this court has repeatedly said that in this type of proceedings, when the facts are in dispute and the inferences and innuendoes to be drawn from the testimony are several, great reliance is to be placed upon the findings of the trial judge. *Clauder v. Morser,* 204 Or 378, 391, 282 P2d 352 (1955). The trial court judge, Judge Dickson, as judge in the department of Probate in Multnomah County, tries more will contest cases than any other judge in Oregon. The court wrote a short letter opinion and made formal findings of facts. In both it found Miss Larson and Mr. Robnett had unduly influenced the testatrix. Some of the conclusions of the majority rest upon conflicting testimony, such as the conclusion as to Mrs. Stack's physical and mental condition and her susceptibility or lack of susceptibility to the influence of others. Other conclusions of the majority necessarily accept as completely accurate the testimony of Miss Larson and Mr. Robnett. By its findings the trial court must necessarily have rejected, as uncredible, all or part of their testimony.

"How can we say the judge is wrong? We never

saw the witnesses." *Clauder v. Morser,* supra, at 392, quoting from *United States v. Oregon Med. Soc.,* 343 US 326, 339, 96 L ed 978, 72 S Ct 690, which in turn quoted from *Boyd v. Boyd,* 252 NY 422, 429, 169 NE 632, 634.

As for the second proposition, Miss Larson, using the language of the residuary clause of the old will, typed the residuary clause in the new will and inserted her name as residual beneficiary.[1] According to Miss Larson, this was done at Mrs. Stack's request. It is certain Miss Larson was not at this time acting as a typist, typing what her employer told her. Therefore, this case can be classified as one in which the beneficiary prepared the will naming her as beneficiary.

However, there was evidence that before the will was executed, Mr. Robnett discussed the typed will with Mrs. Stack, out of Miss Larson's presence, and approved Mrs. Stack's designation of Miss Larson as residual beneficiary.

These facts can be regarded as presenting a situation in which a fiduciary is made a beneficiary, but it is contended that the testatrix had advice independent of the fiduciary. This was the situation in *In re Lobb's Will,* 173 Or 414, 145 P2d 808 (1944), 177 Or 162, 160 P2d 295 (1945). In that case the testatrix was approximately Mrs. Stack's age. Mr. Wilson had been her attorney for some time. According to him, the testatrix told him she wanted to make a will and designate him as one of the bene-

---

[1] Miss Larson's participation was different than that of the typist-beneficiary in In re Estate of Meier, 190 Or 140, 224 P2d 572 (1950). In that case the beneficiary typed the will naming her as beneficiary, but she did so at the direction of the testator's lawyer. The testator's lawyer had no connection with the typist-beneficiary. These facts are not clearly stated in the opinion, but the transcript of testimony clearly proves these were the facts.

ficiaries. Wilson told her she should not do that but should leave it to her relatives. She stated a logical reason why she did not want to do that. He told her he could not draw a will in which he was named a beneficiary. She asked if he could not get somebody else to draw the will and he suggested a lawyer whom he knew had done some legal work for her. The testatrix asked if the man with whom Wilson shared offices could not draw it. Mr. Edward J. Clark was this man. Wilson came back to his office and told this to Mr. Clark, as well as other terms the testatrix wanted in her will. Mr. Clark drafted a will accordingly. Mr. Clark, his wife, and the secretary that Wilson and Clark shared, took the will to Hillsboro, where the testatrix then resided. Mr. Clark went over the will paragraph by paragraph with the testatrix to make certain she was competent and that he had drafted the will correctly. During this conversation the testatrix related what a good friend Mr. Wilson was and that she felt no obligation to her relatives. Mr. Clark did not attempt to dissuade the testatrix from this expressed desire of hers to make Mr. Wilson her principal beneficiary and leave nothing to her nieces and nephews.

This court in the *Lobb* case stated:

"* * * Mr. Clark, whom he called in to draw the will, could not be regarded as an independent advisor. He shared a suite of offices with Mr. Wilson, and handled a considerable portion, if not all, of his court work. * * * his situation [Mr. Wilson's], * * * should have prompted him to insist upon her procuring independent advice. [Citation] By 'independent advice', we do not mean necessarily the advice of a lawyer. The necessities of the situation would have been satisfied if the testator, before executing the will, had had the privilege of

conferring fully and confidentially with *a disinterested and competent person who was disassociated from the interests of the proposed beneficiary.* * * * Mr. Clark, in fact, was not an independent adviser; * * *. His friendship and admiration for Wilson neutralized him in advance." (Emphasis supplied.) *In re Lobb's Will,* supra (177 Or at 187).

In this case the undisputed fact is that Miss Larson had been secretary for the Robnett office since 1927 and for Mr. Edward Robnett since 1946. All the testimony was that she was one of those indispensable secretaries of long experience who can and do perform almost all the duties of a lawyer. With reference to Miss Larson, Mr. Robnett definitely was not "a disinterested * * * person who was disassociated from the interests of the proposed beneficiary."

*In re Lobb's Will,* supra, also involved a legal secretary. This secretary, Miss Bruns, had worked for Mr. Wilson for 20 years. Her relationship to the testatrix was similar to that of Miss Larson to Mrs. Stack, as testified to by Miss Larson. Miss Bruns drew a codicil and had the testatrix execute it. Either Mr. Wilson never saw the codicil or he inspected it only for form. The codicil revoked another bequest in the will and thereby made Mr. Wilson the sole beneficiary. The court commented on this as follows:

"* * * Although it was drawn by his own employee, and its effect was to make him sole beneficiary of Mrs. Lobb's estate, Mr. Wilson once again, as when the will was drawn, failed to observe the amenities of the situation. He says that he did nothing beyond approving the form, but what he should have done was to have taken affirmative steps to eliminate both his employee and himself from a situation in which his personal interests

conflicted with his fiduciary obligations." *In re Lobb's Will,* supra (177 Or at 189).

This court in the *Lobb* cases twice reversed the trial court's finding that the will had been executed without undue influence. There was in those cases testimony that Mr. Wilson had lavished undue attention upon the testatrix. This was denied. There was also testimony that the testatrix had friendly relations with her nephews and nieces. However, if the testimony of Mr. Wilson and his secretary was accepted as accurate, the will would have to be upheld. In *Lobb* the testimony adverse to the beneficiary does not appear to me to be any stronger evidence to support the presumption of undue influence than the uncontradicted evidence here that the testatrix desired that the bulk of her estate go to organizations whose purpose was to aid children, whereas, the will devised it, without any restrictions on its use, to Miss Larson.

In the present case the trial court's finding of undue influence is reversed by the majority. In the *Lobb* cases the trial court's finding of no undue influence was reversed twice by this court.

According to Miss Larson and Mr. Robnett's testimony, Mrs. Stack conferred with Mr. Robnett prior to executing the will. If this be the fact, perhaps the transaction should be viewed as one in which Mr. Robnett prepared the will and Miss Larson should be regarded as simply doing the mechanical work of typing the will. If Mr. Robnett himself had been made the principal beneficary, the comment in 1 Jaureguy and Love, Oregon Probate Law and Practice, 312, § 317, is appropriate: "one cannot read the decisions of the Oregon court without obtaining a distinct, and rather strong, conviction that a lawyer who attempts

to defend a bequest from a client to himself in a will he has prepared faces a real task, an uphill fight."

Here, the lawyer was not bequeathed the residuary. The beneficiary named, however, was in a close, long-standing relationship with Mr. Robnett.

"If the will is drawn, or if its execution or preparation and execution are caused, by the husband, or the father, or the son, or the agent, of the beneficiary, the same principles apply as apply where the beneficiary himself acted." 3 Page, Wills (Bowe-Parker Rev), 623. *In re Estate of Porter,* 192 Or 483, 235 P2d 894 (1951), approved this principle; there an agent was found to have caused the preparation of the will.

In my opinion the rule should be the same whether the beneficiary be a relative of the lawyer drafting the will or his secretary with a long and close relationship. If a client desires to name the lawyer's secretary as a beneficiary, the lawyer should take the same action as if the client desires to name him as a beneficiary; have another attorney, disassociated with the lawyer and his secretary, draft the will and supervise its execution. Any other course rightly will cause suspicion.

The majority opinion believes the five codicils are strong evidence rebutting the presumption of undue influence. They are strong evidence that Mrs. Stack had testamentary capacity at the time of their execution. However, on the question of undue influence they have the same weakness that attended the preparation and execution of the original will. Only Miss Larson can testify what Mrs. Stack's purported directions were for the preparation of the codicils. The purported directions on all five codicils were given only to Miss Larson. All codicils were prepared by either Miss Larson or Mr. Robnett. Again, no inde-

pendent advice was suggested or given. The lawyer supervising the execution of the fifth codicil shared offices with Mr. Robnett. He testified he did not attempt to advise Mrs. Stack and did not discuss with her what was in the codicil or her original will. He asked her only if she knew that by executing the codicil she was changing her will. Only Miss Larson or Mr. Robnett know whether or not Mrs. Stack would have changed the residual beneficiary if she had had independent advice. The codicils were subject to the same presumption of undue influence as was the will.

Aside from the two propositions to which this opinion is primarily directed, I believe the majority is overly persuaded by the argument and seeming fact that Mrs. Stack, rightly or wrongly, did not want her heirs, except her cousin Ray Cline, to receive any of her estate. If this will is set aside these heirs will receive her estate. This same circumstance is true in many will contest cases. However, in all these cases the testator's intention as to what, if anything, his heirs should receive, is only relevant to the issue of whether the named beneficiaries were so named because of undue influence exerted on the testator. If it were exerted the will is set aside. In many instances the laws of descent result in the estate passing to persons different than those whom the testator would have devised it had not undue influence been exerted. The question of whether or not a will is valid is not determined by deciding whether the beneficiary designated by reason of undue influence is closer to the testator's intent than the beneficiaries who would inherit under the laws of descent.

*In re Brown's Estate,* 165 Or 575, 108 P2d 775, concerned a will in which the beneficiaries were the lawyer who drafted the will and another who occupied

a fiduciary relationship to the decedent. This court reversed the trial court and set aside such will. This action resulted in a final disposition contrary to what the court believed was the testator's true intention. The court stated:

> "We are convinced that Tim Brown knew he was making a will but it is not believed that he intended to devise and bequeath absolutely and forever the residue of his estate to the defendants. We think he intended to leave his property in trust with the defendants. * * *" (at 588)[2]

I am fearful that the majority opinion has lowered the high standards which should be observed in judging the validity of a bequest to a lawyer or a member of his office, made in a will drafted by the lawyer or by a member of his office.

O'CONNELL, J., joins in this dissent.

---

[2] The testator's true intent, as found by this court, was to have the lawyer hold the estate in trust until the testator returned to this earth to enjoy his estate. This was a religious belief of many old Indians.