Argued August 24, reversed and remanded November 6, 1978,
reconsideration denied February 13, review denied March 13, 1979

In re The Estate of Cherie Lee Barber.
BARBER et al, *Appellants,*
*v.*
JOHNSTON, *Respondent.*
(No. 124-727, CA 9032)
586 P2d 103

T. Leonard O'Byrne, Portland, argued the cause
and filed the brief for appellants.

Richard L. King, Portland, argued the cause for
respondent. With him on the brief was Gordon M.
MacLaren, Portland.

Before Schwab, Chief Judge, and Lee, Richardson, and Joseph, Judges.

RICHARDSON, J.

## RICHARDSON, J.

In this will contest case the three children of decedent challenge the will admitted to probate. They contend decedent lacked testamentary capacity and the will was the product of undue influence exerted by decedent's uncle, Dwight Johnston, the personal representative of the estate. The court admitted the will to probate and the contestants appeal. Our review is *de novo.*

Decedent, Cherie Barber, who was 39 years old at her death, had a long history of emotional disorders from 1965 until her death by suicide in March, 1976. She had been placed in hospitals for treatment of her emotional problems on several different occasions. She was divorced in 1972 and received custody of two of the three children. Her former husband received custody of the third child who was retarded and a permanent resident of a care facility.

Dwight Johnston, decedent's uncle, had a close relationship with decedent. Her father, Dwight Johnston's twin brother, was deceased, as was her mother. She relied on Dwight Johnston for financial and personal advice and consulted with him regarding major purchases. He was given a general power of attorney by decedent which he utilized to vote her shares of stock in a family corporation. He was also a co-signator on her checking account and had issued checks to pay some of her bills. Dwight Johnston characterized himself as decedent's confidant.

The contested will was executed February 8, 1975. On December 30, 1974, decedent was hospitalized for severe psychosis and chronic schizophrenia. Dr. McCulloch, her treating psychiatrist since 1973, released her to Dwight Johnston and her grandmother, Mrs. Queener, on January 14, 1975. The doctor advised them that she should continue taking the prescribed medication or risk a recurrence of her severe psychosis. On January 27, 1975, Dr. McCulloch again saw decedent and noted she still showed signs of

schizophrenic thought processes. He testified that her condition worsened between January 27, 1975 and the next time he saw her on February 20, 1975.

On February 1, 1975, Dwight Johnston took decedent from her home in Portland to Ontario for a period of rest. He felt she was oversedated and advised her to forego her medication, which she did. Decedent's two children were left in decedent's home in Portland. On February 7, 1975, after talking by telephone to the oldest child, decedent's former husband took the children and their bedroom furniture to his home. When decedent's grandmother, Mrs. Queener, discovered the children had gone to their father's home she called decedent and Dwight Johnston in Ontario. Decedent became very upset and Dwight Johnston was enraged at the conduct of the former husband. Dwight Johnston called the former husband and a heated argument ensued in which following this argument decedent and Dwight Johnston discussed making a will for decedent. Dwight Johnston then typed a will and the next morning procured two persons who witnessed the execution of the will.

The will, which was a rather sophisticated estate plan, provided that upon the death of decedent each child would receive $100 and the balance of her estate would be held in trust with Dwight Johnston as trustee. The income from the trust was to be paid to Mrs. Queener during her lifetime and upon her death to Dwight Johnston and his two living brothers and upon their death the remainder passed to decedent's three children. As trustee Dwight Johnston had authority to invade the corpus of the trust for the benefit of Mrs. Queener and upon her death for the benefit of himself and his two brothers.

After decedent's return to Portland from Ontario she visited her former husband and the children. She told her former husband and her daughter that Dwight Johnston had made her change her will and that it wasn't what she wanted to do. Decedent went to

[ 42 ]

a Portland attorney with her grandmother, Mrs. Queener. She told the attorney she wanted to talk to him about changing her will. The attorney testified he was unable to do so because of decedent's reluctance to talk and the fact that Mrs. Queener dominated the conversation. Although he was aware of the will he did not see it until called as a witness in this proceedings. He testified he was surprised by the testamentary disposition in the will.

Decedent was found dead of an apparent suicide on March 13, 1976. Dwight Johnston was appointed personal representative of the estate and petitioned for admission of the will to probate. The eldest child and the former husband, as guardian ad litem for the two other children, filed petitions contesting the validity of the will. The petitions asserted that decedent lacked testamentary capacity when she executed the will and further that the will was the product of undue influence exerted by Dwight Johnston and Mrs. Queener. Since we determine the will was a product of undue influence it is unnecessary to review the claim regarding decedent's testamentary capacity.

In admitting the will to probate the trial court made no specific findings of fact other than the general findings that the decedent had the requisite testamentary capacity and that the will was not the result of undue influence.

The Supreme Court in *In re Reddaway's Estate,* 214 Or 410, 329 P2d 886 (1958), discussed the various "factors of importance" to be considered in determining whether undue influence was exercised. None of the categories of inquiry set forth by the Supreme Court are to be given priority, they are merely decisional guidelines in assessing the evidence respecting undue influence. The "factors of importance" are grouped in seven categories: (1) participation of the beneficiary in preparation of the will; (2) independent

advice; (3) secrecy and haste; (4) change in the decedent's attitude toward others; (5) change in the testator's plan of disposing of her property; (6) unnatural or unjust gifts in the will; and (7) the susceptibility of the testator to influence.

Ordinarily the will contestant has the burden of establishing the existence of undue influence in the making of the will, *Harritt v. Linfoot, Exec. et al,* 210 Or 354, 311 P2d 450 (1957). However, the Supreme Court has adopted a rule that:

> "The existence of a confidential relationship * * * when taken in connection with other suspicious circumstances may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference.* * *" *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572 (1946).

*See also in re Reddaway's Estate, supra; Carlton v. Wolf,* 21 Or App 476, 535 P2d 119 (1975). The burden does not shift unless there are suspicious circumstances in addition to the confidential relationship.

The evidence establishes that there was a confidential relationship between the decedent and Dwight Johnston. The personal representative does not dispute this conclusion. He argues, however, that Dwight Johnston and his two brothers are only technically beneficiaries of the estate. They are, he contends, persons of substantial means and would have no necessity to receive monies from the trust. The fact remains, however, that the will makes them beneficiaries. The trustee is given authority to pay the income to them and discretion to invade the corpus of the trust for their proven needs. The present intention of the trustee not to distribute any portion of the estate to the three brothers does not affect the legal status of these persons as beneficiaries. Having determined that Dwight Johnston is a beneficiary of the estate and was in a confidential relationship with the testatrix, we next determine if there were sufficient suspicious

circumstances to justify an inference of undue influence and whether such inference is overcome by the proponent of the will. We discusss the evidence in terms of the seven factors set out in *Reddaway.*

(1) *Participation of the Beneficiary in Preparation of the Will.*

Dwight Johnston participated fully in preparation of the will. He discussed the estate plan with decedent, drafted the language to carry out the estate plan, typed the will and procured the witnesses for execution of the will. He was also present when the will was executed and when the witnesses signed.

(2) *Independent Advice.*

Dwight Johnston attempted to contact an attorney on decedent's behalf, but was unable to do so because it was Saturday and the attorney was unavailable. Decedent, had sometime in the past, discussed an estate plan with a friend who had been a secretary in a law office. There is no indication of the extent or quality of the advice she received from her friend. The fact remains at the time the will was drafted she did not have independent legal advice respecting the estate plan. This left her dependent upon her own knowledge and the advice of Dwight Johnston.

(3) *Secrecy and Haste.*

Decedent and Dwight Johnston began discussing preparation of the will on Friday, February 7, 1975, and completed the execution of the will early the next morning. Decedent had custody of the will after its execution and disclosed its existence to a number of people including her former husband. Although the will was drafted in secrecy and haste there was no attempt by decedent to keep its existence a secret. Dwight Johnston explained the haste was necessary to accommodate decedent's travel plans to return to Portland.

(4) *Change in Decedent's Attitude Towards Others.*

Decedent and Dwight Johnston began drafting the will immediately after being notified the two children

[ 45 ]

had moved in with their father. This event was quite distressing to decedent. The will contains an expression of her disenchantment with the two children who had moved in with their father.[1] It is evident that Dwight Johnston shared decedent's animosity toward her former husband and her disenchantment with the two children. In the past she had on several occasions expressed love for her children and a desire that they have what was theirs from the estate.

### (5) *Change in the Testator's Plan of Disposing of Her Estate.*

Decedent had made no prior will and there is scant evidence of any previous estate plan. She had expressed love and concern for her children and indicated she wanted them to have what was theirs from the estate. There is a logical inference that her change in attitude toward the children prompted the testamentary disposition which delayed vesting of the remainder of the estate in the children until the death of all four trust beneficiaries. The children could be denied the trust income for a substantial period of time and the estate could be depleted on behalf of the trust beneficiaries by the time the remainder vested.

### (6) *Unnatural or Unjust Gifts.*

While a testator may dispose of the estate as he sees fit, the fact that the disposition is in an unnatural or unjust manner is a circumstance to be weighed in determining whether undue influence is present. *In re Reddaway's Estate, supra.*

---

[1]
"III

"* * * and I further declare that Alf Dean Barber and Kathy Barber have by their own choice left my home and abode and are at present living with their father Alf C. Barber. I further declare that their action was taken without my knowledge and they have made no effort to contact me in regard to same.

"IV

"Wherefore, in view of the fact my children have made their decision in favor of their father and without common courtesy of notice, I hereby am awarding [$100 to each child] * * *."

[ 46 ]

" '[C]ollateral heirs, such as brothers and sisters, are not "natural objects of bounty" as that term is used in the interpretation of wills * * *.' " *Cline v. Larson,* 234 Or 384, 394, 383 P2d 74 (1963).

In light of the fact that her grandmother, Mrs. Queener, had cared for decedent and her children on many occasions and was subsisting on a limited income, she may be considered, under these circumstances, a natural beneficiary of the estate. The same cannot be said of decedent's three uncles. Decedent's children are the natural objects of her bounty and placing them in an inferior position to the uncles in the estate plan is an unnatural gift. *See In re Reddaways Estate* and *Carlton v. Wolf, supra.*

(7) *Susceptibility to Influence.*

Decedent suffered from a long term chronic schizophrenia. She had been hospitalized for severe psychosis three weeks prior to execution of the will. She was released from the hospital by her treating physician with instructions that she be cared for by Dwight Johnston and continue taking the prescribed medication. As indicated she had ceased taking the medication at the time the will was made.

Her treating psychiatrist testified that although her condition was variable, she was susceptible to influence, was dependent on others for direction and had difficulty making decisions. The doctor stated that decedent, during the period of time the will was drafted, was mentally disorganized and her thought processes would be disconnected if she were presented with complex questions. He stated she was heavily influenced by Dwight Johnston whose judgment she respected and that she would go along with him and become submissive. When presented with the distressing news that her children had moved in with their father, the doctor testified her action would be impulsive, hasty and irrational. He further stated that with the presence of her schizophrenic illness it would be difficult for her to fully understand the implications of

the technical portions of the will. He concluded that on February 8, 1975, if she had been directed by Dwight Johnston to execute such a will she would have followed his instructions.

We conclude, under the definitions and decisional guidelines set out in *Reddaway,* there is an abundance of suspicious circumstances that support an inference of undue influence in execution of the will. The inference has not been rebutted by the evidence offered in behalf of the proponents of the will. The decree of the trial court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.